**M.F.M., Appellant–Respondent,**

**v.**

**J.O.M., Respondent–Appellant.**

**No. WD 48491.**

Missouri Court of Appeals, Western District.

Jan. 3, 1995.

Gail Berkowitz, Kansas City, for appellant-respondent.

Frank B.W. McCollum, Dana L. Parks, Prairie Village, Kan., for respondent-appellant.

Before ELLIS, P.J., and BERREY and SMART, JJ.

ELLIS, Presiding Judge.

This case presents cross-appeals by the parties from orders entered by the Circuit Court of Jackson County on June 30, 1993, August 16, 1993 and August 30, 1993. It involves a dispute between two parents over custody of their son, C.M. ("Child"), who was born August 8, 1980, was twelve years old at the time this action was commenced in late 1992, and is now age fourteen. The route to this court commenced with J.O.M. ("Father") filing his second motion to modify in September, 1992. As subsequently amended, Father's motion sought sole custody of Child, prior court orders having provided joint custody. M.F.M. ("Mother") filed an answer and cross-motion for sole custody. Father then filed a motion for appointment of a Special Master, and nominated three lawyers for appointment. Mother did not object to the appointment of a Special Master, but objected to appointment of any of Father's nominees. She recommended four other lawyers. Without a hearing, Judge Clark appointed one of Father's nominees to serve as Special Master. After extensive discovery, the value and need of which in some instances is subject to serious question, the Master conducted a six-day evidentiary hearing, during which he heard testimony from seventeen witnesses. The Master subsequently filed a report containing findings of fact, conclusions of law and proposed orders, which, among other things, would have continued Child's joint legal and physical custody in Mother and Father, but would have given Father primary residential custody. Mother then filed exceptions and objections to the Master's report. The trial court heard arguments on Mother's exceptions and objections and, subsequently, on June 30, 1993, entered an order rejecting in whole the Special Master's report. The court found that there had been no change in the circumstances of either Child or his custodian such as to authorize a modification, and overruled the motions of both parties for sole custody. It also declared void a provision in a prior custody order authorizing two psychologists, Dr. Vandenberg and Dr. Sweetland, to issue oral and written directives with respect to implementation of recommendations concerning visitation and custody. And finally, the trial court awarded the Master's fee and expenses of $9,400.00, directed Father to pay $15,000.00 toward Mother's attorney's fees, and assessed costs against Father. On August 16, 1993, after Father filed a motion to amend the June 30th order to adopt the Master's Report, and Mother filed a motion for clarification of the award of attorney's fees, the trial court entered a second order denying Father's motion to amend the June 30th order. And finally, on August 30, 1993, the court entered its last order confirming that $15,000.00 was the total award of attorney's fees. Father and Mother both appeal the trial court's orders.

The chronology of events leading up to this appeal is reminiscent of that which this court criticized in *S.K.B. v. J.C.B.*, 867 S.W.2d 651 (Mo.App.1993). Along the way, Mother incurred approximately $52,000 in attorney's fees for this litigation, on top of about $27,-000 in fees for the earlier modification, which is discussed *infra*. Presumably, Father's fees were comparable. Four judges were involved in the case over the course of eighteen months, with Judge Daugherty being involved at the time of the prior modification, but transferring it to Domestic Docket "A", Division 3 when this proceeding began, Judge Clark assigning it to that division and appointing the Special Master, Judge Shinn being assigned to the case and confirming appointment of the Master, and ultimately Judge Mauer receiving the Master's report and rejecting it. In addition, at least three, and perhaps as many as five, psychologists have been used by the parties. The extent of their fees are unknown, but it is reasonable to infer that they were substantial.

The parties were married in 1974, and Child was born in 1980. In February, 1987, the marriage was dissolved, and the court approved a Joint Custody Plan and Agreement. Under this arrangement, Child was to reside with Mother during the week. He was to spend every Wednesday (either for the evening or overnight), one weekend per month (from Friday at 3:00 p.m. until Monday morning), and one 24-hour period on two other weekends per month with Father. In addition, Child was to share the major holidays equally with each of his parents, and to

spend one-half of each summer with each parent. The Plan further provided for mediation by Mary Kay Kisthardt, a University of Missouri–Kansas City law professor, if requested by either party, to address issues relating to their son. Father requested such mediation shortly after the dissolution decree was entered on February 24, 1987, and it continued until October, 1989, when Professor Kisthardt determined the parties were at an impasse "in their ... efforts to resolve their differences concerning their son's care through mediation."

In June, 1988, before these mediation sessions terminated, Father arranged for Child to begin seeing a psychologist, Dr. Bruce Bean. The purpose of the consultations was to assist Child in dealing with the effect of the dissolution, and to provide him with someone in whom he could confide. Father did not inform Mother of these sessions but she learned about them from Child, and initiated a meeting with Dr. Bean herself. Child continued to see Dr. Bean once or twice per month through March, 1992. In addition, during 1990, Dr. Bean tried to act as a mediator between the parties as to matters affecting Child. By November, 1990, Dr. Bean's mediation efforts had also failed.

The first post-decree court action was filed on April 20, 1989, when Father filed a motion to fix dates for his summer custody period. With the help of Professor Kisthardt, the parties were able to agree to a summer placement schedule and Father's pending motion was dismissed.

On February 22, 1991, Father filed a motion to modify the Joint Custody Plan in the original dissolution decree, seeking transfer of Child's primary physical custody to him. Mother countered and, ultimately, in her amended countermotion, sought sole custody of Child and an increase in child support. In November, 1990, prior to filing his motion to modify, Father took Child to a psychologist, Gerald H. Vandenberg, Ph.D. Dr. Vandenberg examined both Father and Child, and was subsequently designated as Father's expert in the modification proceeding. Several months after the motion was filed, Mother took Child to another psychologist, Richard C. Sweetland, Ph.D., who examined both of them. Dr. Sweetland was designated as Mother's expert.

Dr. Vandenberg met with Child and Father on numerous occasions prior to the hearing date set for February 7, 1992, and Dr. Sweetland did likewise with Child and Mother. Dr. Sweetland also met with the Father and Child on one occasion. Both Doctors conducted extensive testing on the parties and Child. On February 6, 1992, the day before the scheduled hearing, the two psychologists gave counsel and the parties their written recommendations of specific goals for the parties, a procedure for implementation of these goals, and a mechanism to resolve disputes. The psychologists suggested therapeutic sessions with the parties the purpose of which was to enhance communication and problem-solving skills between Mother and Father, to improve the father-son relationship, to enhance a sense of growing masculine identity on the child's part, and to increase the amount of contact, and to expand the interaction between father and son.

With these recommendations in hand, and just prior to the hearing, the parties entered into an agreement whereby Father agreed to pay an increased amount of child support, and to pay Child's expenses for such things as school lunches, piano lessons, tuition for private school, and uninsured medical and dental expenses. The parties also agreed to be bound by the psychologists' recommendations regarding child care. A hearing was then held before Judge Daugherty at which Father and Mother, as well as Drs. Vandenberg and Sweetland testified. At the conclusion of the hearing, the court entered an order modifying the original decree in accordance with the agreement of the parties, and incorporated the agreement and the child care joint recommendations of the psychologists into the order. As it relates to the case at bar, the critical portion of the February 7, 1992 order provides:

5. That the Petitioner and Respondent will immediately implement the recommendations set forth in the Joint Report.

6. Psychologists Sweetland and Vandenberg will take the steps necessary to im-

948

plement the recommendations set forth in the Joint Report.

7. Disputes concerning visitation, custody and parenting of [Child] will be promptly resolved by the joint efforts of Psychologists Sweetland and Vandenberg, who will serve as arbitrators in resolving these disputes.

8. The psychologists will have the authority and responsibility to issue oral and written directives to Petition, Respondent and Respondent's wife, [A.M.], with respect to the resolution of disputes and implementation of recommendations concerning visitation, custody and parenting. Petitioner, Respondent and [A.M.] will fully comply with these directives.

9. Petitioner and Respondent may appeal to this Division from any directive issued by the psychologists if he or she believes the directive to be inappropriate.

10. The psychologists may ask this Division to enforce any of the directives they issue.

After the February 7, 1992 agreement and Order, the parties began counseling sessions with Drs. Vandenberg and Sweetland, the first occurring on February 18, 1992. A total of twenty-four such sessions were held through September 11, 1992. Most of the sessions were attended by Father, Mother and the two doctors. Mother did not attend the twenty-second session or the last session. Father's wife, A.M., attended most sessions. Child participated in three sessions.

Many topics were discussed during the sessions. Included among them was whether it was appropriate for Child to spend more time with Father; improving communication between Mother and Father; Child's inappropriate behavior such as thumb-sucking and use of a security blanket; Child's diet and eating habits; and Child's relationship with his Mother and his lack of emotional development. Dr. Vandenberg sent a report to Judge Daugherty on May 11, 1992. He reported that he and Dr. Sweetland had met with the parties eleven times since the February 7th Order, and that while "progress has been slow—painfully so at times—some gains have been made." These included increasing Child's time with Father and great-

er flexibility on the part of the parents in permitting Child to telephone the other parent. On the other hand, the problem of primary concern was that Child was "overly tied to his mother and her protectiveness, and is reluctant to 'branch out' more in the process of rounding out his sense of identity." The doctors planned to lay out a more structured agenda and a timetable for "implementing accelerated changes in an incremental fashion."

The next report to Judge Daugherty was from Dr. Sweetland on August 28, 1992. The report indicated progress remained painfully slow but that Child had agreed "to end his long practice of sleeping with a security blanket although he continues to suck his thumb." The report also contained the following:

Dr. Vandenberg and I have ongoing concerns regarding [Child's] growth and development and have discussed at length ways in which he can gain a greater sense of self worth and maturity. We both agree that it would be beneficial to [Child] to spend the next year residing with his father and stepmother in order to solidify and strengthen his relationship with his father and to permit him to gain needed psychological individualization from his identification with his mother. It is our recommendation at this time, therefore, that for a period of one year [Child] should reside primarily with his father, beginning before the start of this school year, and have regular visits with his mother.

This recommendation is clearly the precipitant for the instant litigation. It was met with great resistance by Mother. She did not appeal the recommendation to Judge Daugherty as permitted in the February 7th Order, but rather simply ignored it. On September 11, 1992, Father filed a motion to modify seeking implementation of the recommendation. And, on October 1, 1992, Mother filed an answer and counter-motion to modify, seeking sole custody of Child, termination of the joint custody plan and termination of the "arbitration agreement" with Drs. Vandenberg and Sweetland, among other things.

From the record, it appears that Drs. Vandenberg and Sweetland are highly qualified, well-respected psychologists. They are licensed to practice in Missouri, and each have over 20 years of experience as practicing clinical psychologists. In addition, both have extensive experience in custody disputes. As noted previously, Dr. Vandenberg was selected by Father as his expert, and Dr. Sweetland was selected by Mother as hers. Nevertheless, both Dr. Vandenberg and Dr. Sweetland told Mother and Father when they were retained that their recommendations concerning the custodial parent would be based exclusively on their respective determinations as to what was in Child's best interests. At the time of the February, 1992 hearing, both doctors were of the opinion that Child's physical placement should remain with Mother. However, by the time of the August 28, 1992 report to the court, both psychologists recommended physical placement of Child with Father for a period of one year. And, by the time of trial, based primarily on Mother's reaction to the August 28th recommendation, both were recommending sole custody of Child with Father.

Of the twenty-four counseling sessions held by Drs. Vandenberg and Sweetland between the modification order of February 7, 1992 and September 11, 1992, Child was only present for three, and one of those was devoted almost exclusively to trying to persuade Child that it would be in his best interests to live with his father for one year as recommended by the psychologists. Child was unpersuaded and voiced opposition to the idea. In addition, the psychologists essentially focused on a few specific behavioral traits of Child which were deemed inappropriate as evidence that Child was overly tied to Mother. Child had apparently slept with, or took to bed with him, a security blanket until a short time prior to this action being filed. He also sucked his thumb, but apparently this was in private, or at least only while in the company of his parents. He also had a number of stuffed animals which he either kept in his room, or put on his bed when retiring. Finally, Child was considered a "picky" eater. In other words, the psychologists' opinions were based on very limited contact with Child and with minimal information on how Child interacted with his peers and adults.

The psychologists' testimony, as well as the testimony of Father and his current wife, was the only evidence presented by Father. Mother, on the other hand, presented no expert psychological evidence. However, she testified herself, and called thirteen other witnesses, including Child's pediatrician, several teachers, friends and neighbors, all of whom generally testified that Child and his mother had a good relationship, that Child was a "normal boy" who interacted well with people, both adults and children, and that Mother was an involved and good parent. There was no mention in any of this testimony of Child sucking his thumb, using a security blanket or stuffed animals. To the contrary, Mother's evidence described a very bright, articulate child, with a sense of humor that goes beyond the ordinary. The teachers' testified Child did well in school, and was actively involved with other students. Neighbors testified that he regularly played with other children in the neighborhood and was well-liked. He had played in a basketball league, enjoyed riding his bicycle, and was, in all respects, a "normal boy."

After the six days of testimony, the Master entered his findings of fact and conclusions of law recommending continued joint legal and physical custody in Mother and Father, but placing primary residential custody with Father. Mother then filed her exceptions and objections to the Master's report and the trial court, after a hearing, entered its order rejecting the Master's report in its entirety, finding that the evidence did not reveal a substantial change in the circumstances of Child or his custodian since entry of the February 7, 1992 modification such as to warrant a modification, and therefore, overruling both parties motions to modify. The hearing conducted by the trial court did not include the reception of any evidence, but rather just presentation of argument by counsel. Both parties filed notices of appeal to this court.

### STANDARD OF REVIEW

The appellate court's standard of review for cases tried to the court without a

jury appears in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The appellate court must sustain the judgment of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32. In applying this standard, we invoke the rule of due deference, and view the evidence in the light most favorable to the judgment, disregarding all contrary evidence and permissible inferences, and accepting the trial court's determinations of credibility. *Mehra v. Mehra*, 819 S.W.2d 351, 353 (Mo. banc 1991). Of necessity, however, the appellate court must weigh the evidence if the record engenders a firm belief that the judgment is wrong. *Hancock v. Secretary of State*, 885 S.W.2d 42, 46 (Mo. App.1994); *State ex rel. Rice v. Bishop*, 858 S.W.2d 732, 737 (Mo.App.1993).

## USE OF SPECIAL MASTER

■ As a preliminary matter, it is apparently necessary that we again comment on the use of masters in custody proceedings. The use of a master is authorized by Rule 68.01, which provides, in pertinent part:

(a) **Appointment and Compensation.** Each circuit court in which any action is pending may appoint a master therein....

(b) **Reference.** A reference to a master shall be the exception and not the rule. In actions ... to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

In this case, Father requested appointment of a master, alleging exceptional conditions. Summarized, the exceptional conditions were that (a) the case would involve "several" days of testimony, including testimony from two expert witnesses; (b) discovery disputes might arise which would require judicial resolution; (c) the condition of the court's docket would not permit it to "accomplish items [ (a) and (b) ]" within the near future; and (d) Mother would use the court's inability to hear a protracted matter to delay resolution and a possible change of custody. Mother admitted (a) and (c) above, and did not object to appointment of a master. Stripped of extraneous matter, the exceptional condition alleged for appointment of the Master was calendar congestion.

In *S.K.B. v. J.C.B.*, 867 S.W.2d 651 (Mo. App.1993), this court criticized the use of masters in custody proceedings. The majority there declared:

Appointment of the Master was erroneous because this case did not involve exceptional circumstances.... As a general rule, calendar congestion alone would seem to be insufficient to provide the exceptional conditions under Rule 68.01.

*Id.* at 658. The majority went on to hold in *S.K.B.* that it was erroneous to refer the case to a Special Master because of calendar congestion. For the same reason, we hold it was error in this case to refer the matter to the Master. And we say again, as we did in *S.K.B.*, that custody cases do not lend themselves to being heard by a master, and the present case is an even better example of the reasons why they do not than was *S.K.B.*

■ As noted *supra*, we give deference to the findings of the trial court in custody proceedings. Indeed, in such proceedings, the deference given is greater than in any other type of case. *Gulley v. Gulley*, 852 S.W.2d 874, 876 (Mo.App.1993). The rationale for giving such deference is that because the trial court has the opportunity to observe the witnesses and hear their testimony, it has a superior ability to judge the credibility of witnesses, including their sincerity and character and other intangibles which may not be completely revealed by the record. *Brawley v. McNary*, 811 S.W.2d 362, 365 (Mo. banc 1991). Where the best interests of a child are concerned, it is essential that the trial court have the opportunity to observe the demeanor of the conflicting parties. While in the instant case the Master did not interview Child as authorized by § 452.385 [1], the value of such an interview is lessened if not totally destroyed if it is conducted by a master rather than the trial judge. Where a master is used, the trial court sees not the child, but only a cold record of the interview. As we

---

1. All statutory references are to RSMo 1986 unless otherwise indicated.

said in *S.K.B.*, "Masters are appointed to 'aid judges in the performance of specific judicial duties, ...' and not to place the judge into a position of a reviewing court." 867 S.W.2d at 658. In conclusion, we cannot emphasize too strongly our disapproval of the use of masters in custody proceedings.

■ While we find it was error to refer this matter to a master, we are mindful that this litigation has been pending since September 11, 1992—a period of over two years. The parties, and far more importantly, Child, have been in turmoil for even longer, dating back to February 22, 1991, when the first motion to modify (which resulted in the February 7, 1992 modification) was filed. When the first motion to modify was filed, Child was ten years old. He is now fourteen. Under these circumstances, and because we conclude the trial court's judgment is correct, we will not reverse and remand because it would merely continue the anxiety and feelings of uncertainty Child has most assuredly experienced. Rather, we will decide the appeal on its merits.

### POINTS ON APPEAL

Father raises two points on appeal. First, he asserts the trial court erred in applying § 452.410 by determining that "the testimony of two qualified psychologists could *not* be the basis for a finding that a change has occurred in the circumstances of the child or his custodian." And, second, Father complains the trial court erred by not implementing the Master's recommendation for residential placement in that such decision was against the weight of the evidence. Mother likewise presents two points in her appeal. She contends, first, that the trial court erred and abused its discretion by awarding joint legal custody because it was against the weight of the evidence. The second point is that the trial court erred and abused its discretion in its order of attorney's fees because the order was against the weight of the evidence. Mother was the petitioner in the original action and, therefore, pursuant to Rule 84.04(j), since there are cross-appeals, she is treated as the appellant and her points will be discussed first.

### MOTHER'S APPEAL

■ Mother first argues that the trial court erred and abused its discretion by awarding joint legal custody. In her counter-motion to modify, she had prayed for termination of the joint legal and physical custody plan, and that she be awarded sole residential custody of the minor child. Ironically, in arguing her exceptions and objections to the Master's report before the trial court, and in her reply to Father's points in this appeal, Mother contended there was no change of circumstances. Nevertheless, in this point she asserts the trial court "awarded" joint legal custody and that "said custody award was against the weight of the evidence." Mother's point is without merit. The trial court made no *"award"* of custody. It found that the evidence did not demonstrate that "there has been a substantial or significant change in circumstance which has occurred in the circumstances of the child or his custodian since the time of the prior decree which would warrant a change in the child's physical custody." The trial court therefore declared that it was "without authority to modify a prior custody decree under Rs.Mo. 452.410 (1990) [sic]." It then overruled the motions to modify filed by Father and Mother, declared the provision of the February 7, 1992 modification order giving Drs. Vandenberg and Sweetland "the authority to modify the custody or visitation provisions" void, and confirmed that all other provisions of the February 24, 1987 Decree of Dissolution of Marriage and the Modification Order of February 7, 1992 "shall remain in full force and effect." Thus, the trial court made no award of custody.

Presumably, Mother is claiming the trial court erred by *permitting joint custody to continue.* The thrust of Mother's contention is that there was substantial evidence in the record that the parties are unable to cooperate with each other. She then cites *Burkhart v. Burkhart*, 876 S.W.2d 675 (Mo.App. 1994) for the proposition that "[w]here the record is devoid of substantial evidence that the parties have a commonality of belief concerning parental decisions and the willingness and ability to function as a unit in making those decisions, it is error for the

trial court to award joint legal custody." *Id.* at 680. We do not disagree with the quoted language. However, Mother misses the point of the trial court's decision.

The parties' marriage was dissolved by decree dated February 24, 1987. The decree was modified on February 7, 1992. This action was filed slightly more than seven months later, on September 11, 1992. At the hearing on February 7, 1992, both parties testified that the modification order, which continued joint legal custody, was in the best interests of the child. The August 28, 1992 recommendation of Psychologists Vandenberg and Sweetland provided for continuing joint legal custody, and Father's original motion to modify filed on September 11, 1992 prayed for continued joint legal custody. It was only after that motion to modify was filed that either party decided joint legal custody should not continue. And it is clear that each party's request to terminate the joint custody arrangement was part of their pre-trial posturing and maneuvering.

While there is much evidence in the record concerning disagreements between the parties, the vast majority of the incidents and occurrences were prior to February 7, 1992. The record simply fails to reveal a striking increase in such difficulties between the date of the modification and the hearing before the Master. Indeed, from the record, it could reasonably be concluded that things improved between the modification of February 7, 1992 and the time Father filed his motion to modify on September 11, 1992. Section 452.410, RSMo Supp.1990, provides, in pertinent part:

> [T]he court shall not modify a prior custody decree unless it has jurisdiction under the provisions of section 452.450 and it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.

While the parties may have experienced difficulties in communicating and cooperating, the circumstances have not changed since the prior modification so as to evidence a total lack of commonality of belief and inability to make parental decisions. Mother's Point I is denied.

■ In her second point, Mother contends the trial court erred and abused its discretion in its order of attorney's fees to be paid by Father to Mother. The Master found that Mother's litigation expenses were approximately $52,000, and recommended that Father be required to pay $33,750 of that amount. The trial court, as noted earlier, rejected the Master's report in whole. In its June 30, 1993 judgment, the court awarded Mother attorney's fees in the total amount of $15,000. Mother filed a motion for clarification of this award. The clarification was requested because Father had previously paid $10,000 pursuant to a temporary award of attorney's fees made by the Master, and the issue was whether the court's award of $15,000 was in addition to that amount, or included it. A hearing was held on the motion during which counsel presented arguments. Thereafter, on August 30, 1993, the trial court entered its findings of facts and conclusions of law on the issue of the award of attorney's fees, and confirmed that the total amount of the award was $15,000, which included the $10,000 previously paid.

Section 452.355.1, RSMo Supp.1990, provides, in part:

> The court from time to time after considering all relevant factors including the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under sections 452.300 to 452.415 and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment.

The trial court enjoys broad discretion with regard to award of attorney fees, and only upon a showing of an abuse of that discretion will an appellate court interfere. *Nix v. Nix,* 862 S.W.2d 948, 952 (Mo.App.1993). "The trial court [is] not required to hear evidence on the extent and value of the legal services rendered, as the judge is considered an expert on that question and can fix that amount without the aid of evidence." *In re Marriage*

*of Haubein,* 726 S.W.2d 433, 437 (Mo.App. 1987). To establish abuse of discretion by the trial court in awarding attorney's fees, the complaining party must demonstrate that the award is against the logic of the circumstances and is arbitrary and unreasonable. *Smith v. Smith,* 839 S.W.2d 382, 386 (Mo. App.1992).

■ In its findings of fact on the issue of attorney's fees, the trial court noted that during the hearing in which it heard arguments on Mother's exceptions and objections to the Master's report, the court raised the jurisdictional issue as to whether there was evidence of a change of circumstances such as to give it authority to modify pursuant to § 452.410, RSMo Supp.1990. The trial court also observed that it found as a matter of law that there had been no change of circumstances, and further that Mother's attorney stated in argument that she thought "from the onset that there had been no change in circumstances in this case." In its conclusions of law, the court then stated:

11. Given the Petitioner Attorney's statement regarding her knowledge of the lack of change in circumstance issue from the onset, this court now finds that the Petitioner's proper method for disposition of the Respondent's Motion should have been by way of a Summary Judgment Motion on the issue of jurisdiction of the custody matter.

12. Given the simple method of disposition by Summary Judgement, this court now finds that the $15,000.00 award of attorneys fees and costs should encompass the entire attorney fees and costs charged by Petitioner's Attorney in the defense of such a case.

13. This court finds that any additional fees or costs were and are unreasonable and unnecessary in this case.

Mother argues that the court's finding that her attorney's fees of $50,000 were unreasonable indicates indifference and a lack of proper judicial consideration. She states that Missouri appellate courts have frequently upheld large attorney's fees awards and points to *Smith v. Smith,* 724 S.W.2d 541 (Mo.App. 1986) where an award of $27,335 in a custody modification proceeding was found not to be excessive. Although the *Smith* court did approve the award, it stated that such an award in a custody proceeding was "almost excessive per se; however, the record shows father brought on much of the fees." *Id.* at 543–44. Mother contends that Father caused much of the fees in the instant appeal to be incurred just as in *Smith,* and therefore, the trial court abused its discretion by awarding only $15,000.

The record clearly supports the trial court's findings. During argument before the court, Mother's attorney made the following statements:

Well, Your Honor that was our argument throughout the depositions. We don't believe there was any change in circumstances.

\* \* \* \* \* \*

I don't think, Your Honor, there was any change of circumstances.

\* \* \* \* \* \*

There were none stated, Your Honor. And that was exactly our point in the depositions which were read into evidence as admissions, [Father] admitted nothing changed. . . .

We cannot say, as we must if we are to sustain Mother's argument, that the trial court abused its discretion by awarding only $15,000 in attorney's fees. Therefore, Mother's Point II is denied.

### FATHER'S APPEAL

■ We turn now to Father's appeal. He first argues that the trial court erroneously applied § 452.410. He asserts the trial court held that the testimony of two qualified psychologists could not be the basis for a finding that a change has occurred in the circumstances of Child or his custodian, and that such a holding is an erroneous application of § 452.410. In support of this argument, Father points to the following exchange between the trial judge and Father's attorney during the July 22, 1993 hearing at which the court overruled Father's motion to amend the court's order of June 30, 1993.

THE COURT: There is no question in my mind Ms. Nigro [counsel for Father] that

the experts have changed their minds. That's the issue. I say the experts changing their mind as a matter of law does not constitute a change in circumstances in this case.

\* \* \* \* \* \*

Everything I have been able to tell from this case is that the boys [sic] been sucking his thumb for a long time, long before February the 7th. As I read the transcript, he has departed from the blanket or teddy bear or whatever he used to have so there's been a change in circumstances with respect to the way the boy has been acting. He's been moving in the right direction as far as I am concerned. The only thing that's here and I will admit there isn't any question about it, it's very clear the experts have changed their minds. But the change in mind as far as I am concerned by experts constitutes no change in circumstances. Now, if there were some facts that changed with respect to the boy, that's another thing but his circumstances are exactly the same today as they were on February 7, 1993 is it?

MS. NIGRO: '92.

THE COURT: '92. His circumstances are exactly the same. The only thing that's changed is the opinion of the experts has changed. And I am saying as a matter of law, a change in the opinion of the experts does not constitute in law, a change in circumstances as contemplated by the statute.

As noted previously, this case comes to us on the trial court's orders of June 30, 1993 (rejecting the Master's report in whole and finding no change of circumstances), August 16, 1993 (denying Father's motion to amend the order of June 30, 1993), and August 30, 1993 (clarifying the award of attorney fees). Based on the record before us, it appears neither party requested findings of fact and conclusions of law, pursuant to Rule 73.01(a)(3), from the court prior to any of the orders. Nevertheless, in the June 30, 1993 order the court gratuitously did make some minimal findings, including the following:

The court specifically finds after a careful review of the [sic] Dr. Vandenberg and Dr. Sweetland's testimony, that the mid-course change of two experts opinions and recommendations regarding placement of custody, is not a basis in which to find that a change of circumstances has occurred as a matter of law.

The August 16, 1993 order contained no findings of fact or conclusions of law. However, the August 30, 1993 order was styled "Findings of Fact and Conclusions of Law," and did contain findings and conclusions relative to Mother's request for clarification of the attorney's fee award in the June 30, 1993. Because, on appeal of a court tried case, we are concerned with the correctness of the result, not necessarily the course taken to reach it, we will review these gratuitous findings and conclusions and affirm the trial court's judgment if correct, on any reasonable theory supported by substantial evidence. *United Mo. Bank, N.A. v. Beard,* 877 S.W.2d 237, 239 n. 2, 241 (Mo.App.1994).

The record clearly demonstrates that Drs. Vandenberg and Sweetland both believed that it was best to continue joint custody at the time of the February 7, 1992 modification. They further believed that the child should remain in primary residential custody with the Mother at that time. The evidence is likewise clear that within approximately six months, by August, 1992, both psychologists were of the opinion that "for a period of one year [the child] should reside primarily with his father ... and have regular visits with his mother." It should be noted that in their August 28, 1992 report to Judge Daugherty, the psychologists did not recommend termination of joint custody but rather merely that the Father be the primary residential custodian for one year. By the time of trial, however, both doctors were saying there should be a transfer of custody of the child to Father. This conclusion was based, if not entirely, at least partially on Mother's unwillingness to acquiesce with their recommendation of August 28, 1992.

Nevertheless, Father, in focusing on the trial court's gratuitous comments regarding a change of opinion by the psychologists, argues that the court misconstrued the testimony of Drs. Vandenberg and Sweetland as representing only a change of opinion on

their part, when, in actuality, Father contends, their testimony demonstrated that Child's mental health was different than it was in February, 1992, that he was not mentally healthy at the time of trial, and that his mental health was worse than it was at the time of the prior modification.

Father's point must fail for several reasons. First, Father is placing a construction on the psychologists' testimony that is not necessarily supported by the record and, moreover, a review of the entire testimony of the two doctors supports the trial court's position that they had merely changed their opinions. Second, and more importantly, the doctors based their opinions on their view that the child was overly tied to his mother and her protectiveness. Father overlooks the fact that Mother presented the testimony of thirteen witnesses, teachers, neighbors, friends, and relatives, all of whom testified that they had not observed any unusual problems with the child, that he was a "normal boy," that he and his mother had a good, loving relationship, and that it was a healthy relationship. The trial court was free to believe or disbelieve all, part or none of the testimony of any of the witnesses. *Burkhart v. Burkhart,* 876 S.W.2d 675, 678 (Mo.App. 1994). Thus, there was substantial competent evidence in the record to support a contrary finding that the child was not overly tied to his mother and her protectiveness and that there was no problem with the child's mental health at the time of trial or at the time of the prior modification. Indeed, the testimony of Mother's witnesses, if believed, as it apparently was, would indicate that there was no difference in the circumstances of Child or Mother between February 7, 1992 and the time of this trial. Therefore, the trial court's ultimate determination that there had been no change in circumstances is amply supported by the record. Father's first point is denied.

For his second point, Father contends the trial court abused its discretion by not implementing the Master's recommendation that residential placement of Child be transferred to Father in that not changing residential placement was against the weight of the evidence. Father argues four sub-parts under this point, each of which will be addressed.

■■■■■ Father asserts first that Mother made admissions establishing a change of circumstances. He points to Mother's counter-motion to support this argument, noting that the counter-motion alleged a sufficient change had occurred as to justify an award of sole custody. Then, relying on *Plunkett v. Aubuchon,* 793 S.W.2d 554, 557 (Mo.App. 1990) for the general proposition that allegations or admissions contained in pleadings upon which a case is tried are binding on the pleader, Father reasons that Mother admitted a change in circumstances such as to justify modification of the decree, and therefore the court erred in finding no change in circumstances. It is true that when allegations in a petition are admitted in an answer, it generally constitutes a waiver of all controversy on those allegations. *Huber v. Western & S. Life Ins. Co.,* 341 S.W.2d 297, 299–300 (Mo.App.1960). However, Father is relying on allegations in Mother's counter-motion to support his argument, not admissions in her answer to his motion.[2] For Father to avail himself of allegations contained in Mother's counter-motion as admissions, it was necessary for him to offer the counter-motion into evidence, read portions thereof into evidence, or ask the court to take judicial notice of its own file. *Kelsey v. Nathey,* 869 S.W.2d 213, 217 & n. 4 (Mo.App.1993). Father did none of these. Therefore, the purported admission was not evidence and could not be used against Mother. *Id.; Martin v. Yeoham,* 419 S.W.2d 937, 952 (Mo.App. 1967).

■■■■ Moreover, we do not read *Plunkett* as holding that where both parties in their pleadings admit to substantial and continuing changes in the circumstances of the child or the child's custodian, that such admissions

2. The legal file reveals that Father filed his motion to modify on September 11, 1992, and Mother filed her answer and counter-motion on October 1, 1992. However, the Legal File also contains a first amended motion filed by Father on December 12, 1992, to which there is no responsive pleading by Mother in the record. Likewise, there was no responsive pleading filed by Father to Mother's counter-motion.

are binding on the court so as to require a modification of a prior decree. Section 452.410 provides, in pertinent part:

> Except as provided in subsection 2 of this section, the court shall not modify a prior custody decree unless it has jurisdiction under the provisions of section 452.450 and it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.

Under the statute, the court must *find* that changes have occurred and *"that modification is necessary to serve the best interests of the child."* This finding is a legal conclusion. Thus, while the parties may both agree, or admit in their pleadings, that certain changed circumstances exist, and while they may even agree or admit that such changes justify a modification to serve the best interests of the child, such admissions do not compel the trial court to make the required conclusion of law. Based on such agreed facts or admissions, and any other evidence before it, the court must make its own independent determination whether a modification is necessary to serve the child's best interests. "The court is without jurisdiction to modify an original custody decree on a stipulation entered into by the parties but must conduct a hearing and can only act upon presentation of facts from which it may be determined that a change in custody would be in the best interests of the children." *Riley v. Riley,* 643 S.W.2d 298, 300 (Mo.App.1982); *see also State ex rel. Perrella v. McGuire,* 757 S.W.2d 223, 225 (Mo.App. 1988). For these reasons, Father's argument must fail.

In the second sub-part of this point, Father contends the trial court's decision is against the weight of the evidence. This is but a rehash of the arguments made in Father's Point I. After a thorough review of the record, we do not have "a firm belief that the decree ... is wrong," *Murphy,* 536 S.W.2d at 32, nor are we "firmly convinced that the welfare of the [child] requires some

other disposition." *In re Marriage of Wofford,* 589 S.W.2d 323, 326 (Mo.App.1979).

Father next asserts that, absent a showing that the Master was in error, it is the Master's judgment that should be followed. The thrust of this argument is that the Master was sitting as the trier of fact, heard and observed the witnesses, and weighed their credibility. Father reasons that, due to certain language in the Master's recommendations, the Master found the testimony of the psychologists compelling. Father concludes that it is the Master to whom we should give deference and points us to the following language in *Wilhelmsen v. Peck,* 743 S.W.2d 88 (Mo.App.1987), urging that we substitute the words "Special Master" for "trial court:"

> We can and should indulge the presumption that the trial court considered all the evidence and decreed custody of the boys by what it believed to be their best interests and, in doing so, we must bear in mind that the **trial court was in a better position not only to judge the credibility of the witnesses directly, but also the parties' sincerity and character and other trial intangibles which may not be completely revealed by the record.**

(Emphasis added). Father failed to cite any authority for the position he urges.

■ When an appellate court appoints a Special Master to take evidence pursuant to Rule 68.03, "the Master's Report is to be accorded the weight and deference which would be given to a court-tried case by a reviewing court." *Ex parte Ray,* 573 S.W.2d 152, 156 (Mo.App.1978). As this court said in *In re W.K.M.,* 537 S.W.2d 183, 186 (Mo.App. 1976):

> [I]t is obvious that a proceeding [under Rule 68.03] resulting in a Special Master's Report, findings of fact, conclusions of law and recommendations, in order to give any real meaning to the Rule, should logically be accorded the weight and deference which would be given to a court-tried case by a reviewing court. Both the law and the evidence should be reviewed as in suits of an equitable nature with regard given to the opportunity of the Special Master to have viewed and judged the credibility of witnesses.

*See also State ex rel. Busch v. Busch,* 776 S.W.2d 374, 377 (Mo. banc 1989) (stating and applying this rule of review).

However, the rule is clearly different when an appellate court reviews the decision of a trial court which appointed a master pursuant to Rule 68.01. In *Schwartz v. Shelby Constr. Co.,* 338 S.W.2d 781 (Mo.1960), the court stated that "[s]ince the enactment of our present Civil Code, the report of a [master] no longer stands as a special verdict, and the appellate court is required under § 510.310 ... to review the case 'as in suits of an equitable nature.'" *Id.* at 788. The version of § 510.310 referenced in *Schwartz* was superseded by former Rule 73.01(d), which was later revised into current Rule 73.01, effective January 1, 1975. *See Murphy v. Carron,* 536 S.W.2d 30, 31 (Mo. banc 1976). *Murphy,* of course, interpreted Rule 73.01 and established the standard of review for court-tried cases. It is, therefore, clear that appellate courts review the decision of the trial court, not the findings and recommendations of the master. Thus, we view the evidence in the light most favorable to the trial court's judgment, disregarding all contrary evidence and permissible inferences, and accepting the trial court's determinations of credibility. *Mehra,* 819 S.W.2d at 353. We therefore reject Father's contention.

Father's Point II, as noted previously, is essentially that the trial court's decision is against the weight of the evidence. However, as the final sub-part of this point, he asserts that the trial court's reliance on *Moore v. Moore,* 849 S.W.2d 652 (Mo.App. 1993) is misplaced. This seems to be an argument that the trial court either misinterpreted or misapplied the law rather than one that the decision is against the weight of the evidence. It is not clear how the court's reliance on an appellate decision supports the argument that the trial court disposition was against the weight of the evidence. Nevertheless, to the extent the contention is addressable, we will try to do so.

In the gratuitous findings of fact and conclusions of law made by the trial court in its August 30, 1993 order relative to Mother's motion for clarification of the award of attorney's fees, the court noted that, on its own research, it found and followed *Moore,* pre-sumably in entering its order of June 30, 1993. The court also quoted from *Moore* to the effect that the fact that a child is older and in greater need of more time with his father is not a change in circumstance justifying a transfer of custody. The thrust of Father's argument is to try to distinguish the facts in *Moore* from those in the instant case. We find this argument to have no merit. While the facts in *Moore* are not identical to those in the case at bar, we do not believe the trial court's purported reliance on it was necessarily misplaced. More importantly, however, as we have already said, we are not concerned with the route the trial court took to reach its decision, but rather with whether the judgment is correct under any reasonable legal theory supported by the evidence. We have already concluded that it is and therefore, Father's Point II is denied.

## DELEGATION OF JUDICIAL AUTHORITY

While not raised by either party on appeal, it is appropriate for us to comment on that part of the trial court's judgment declaring void the provision in the February 7, 1992 modification authorizing Psychologists Vandenberg and Sweetland to issue oral and written directives concerning visitation and custody, and requiring the parties to comply with those directives. The trial court was correct. A court cannot abdicate or delegate, in whole or in part, its judicial power. *S.K.B. v. J.C.B.,* 867 S.W.2d 651, 658 (Mo.App.1993). The trial court derives its jurisdiction to determine custody of children in marriage dissolution cases by statute. It has a special obligation in orders pertaining to custody of minor children and must act upon evidence adduced. *Riley v. Riley,* 643 S.W.2d 298, 300 (Mo.App.1982). The court must act in the best interests of the child. § 452.410. Permitting others to alter custody arrangements is an impermissible delegation of judicial authority.

For the reasons stated, the judgment is affirmed.

All concur.