COUNTRY CLUB OF THE OZARKS, LLC, a Missouri limited liability company, Donker, LLC, a Missouri limited liability company, and Branson National Golf, LLC, a Missouri limited liability company, Plaintiffs–Appellants/Respondents,

v.

CCO INVESTMENTS, LLC, a Missouri limited liability company, and Mr. Cecil Van Tuyl, Defendants, Counter–Claim Plaintiffs, and Third–Party Plaintiffs–Respondents/Cross–Appellants,

v.

Charles Barnes, The Cox Family Trust, Michael Frangkiser, Anthony Frazier, Anthony Frazier, as Personal Representative of the Estate of Jack Frazier, Dick Gass, The Osborn Sales Company Integrated Profit Sharing Plan and Trust, and Dr. William Zeller, Third–Party Defendants–Appellants/Respondents.

No. SD 30458.

Missouri Court of Appeals,
Southern District,
Division Two.

March 25, 2011.

Thomas W. Millington, Springfield, MO, for Appellants/Respondents.

Robert W. Tormohlen, Kansas City, MO, for Respondents/Cross–Appellants.

NANCY STEFFEN RAHMEYER, Presiding Judge.

CCO Investments, LLC ("CCO"), is a limited liability company formed by members Country Club of the Ozarks, LLC ("Country Club"), and Cecil Van Tuyl ("Van Tuyl").[1] In 2006, CCO sold its only asset, approximately 345 acres of land. At issue in this case is the distribution of the remaining proceeds of CCO, $5,669,680.23, following the sale of its asset, the approximately 345 acres of land. The disputes on appeal, more specifically, revolve around whether three categories of money, totaling $3,656,656, provided by Van Tuyl to CCO, are entitled to interest, and if so, simple or compound interest, and whether one category of money, totaling at least $279,959, is owed to members of Country Club. All parties[2] appeal from the judgment distributing the funds. Finding no error, we affirm.

We note that the parties agree on very little; they do not even agree on the reason for their joint venture. Country Club contends the two joined forces to develop a golf course and the surrounding lots; Defendants contend Van Tuyl only entered the company to develop the properties surrounding the golf course that Country Club was to engage a developer to build. Initially, the parties do not agree on our standard of review. Country Club contends our review is de novo because the

---

1. The Operating Agreement at issue in this case refers to CCO Investments, LLC, as "the Company" and Country Club of the Ozarks, LLC, as "CCO"; however, for ease of reference, we will refer to the parties as set forth above and have made the appropriate substitutions in all cited Operating Agreement excerpts.

2. Country Club, Donker, LLC, and Branson National Golf, LLC, sued CCO and Van Tuyl.

CCO and Van Tuyl, in turn, filed counterclaims. CCO and Van Tuyl are proceeding on appeal together. In this opinion, at times we must refer to CCO and Van Tuyl collectively when addressing their arguments, and individually when discussing facts. For clarity's sake, when referring to their arguments we will refer to CCO and Van Tuyl collectively as "Defendants," otherwise we will refer to them as Van Tuyl and CCO.

trial court appointed a special master pursuant to Rule 68.01 [3] and adopted the findings and conclusions of the master in toto. Because there was no additional evidence, Country Club contends we give no deference to the findings of fact and review the conclusions of law de novo. Defendants argue our review is simply as any other court tried case with the standard of review set originally by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

 Pursuant to Rule 68.01, a circuit court may appoint a special master to aid a judge in specific duties. A court cannot, however, "delegate or abdicate, in whole or in part, its judicial power." *D'Agostino v. D'Agostino*, 54 S.W.3d 191, 200 (Mo.App. W.D.2001). "It is within the trial court's discretion to adopt, modify, or reject, all or any part of the master's report." *Lediner v. Harris*, 145 S.W.3d 479, 484 (Mo.App. S.D.2004). On appeal, we "review the decision of the trial court, not the findings and recommendations of the master." *M.F.M. v. J.O.M.*, 889 S.W.2d 944, 957 (Mo.App. W.D.1995).

 We find *M.F.M.* instructive. In *M.F.M.*, a special master was appointed by the trial court to aid the trial court in determining whether modification of custody of the parties' child was proper. *Id.* at 946. The special master made recommendations following a six-day evidentiary hearing. *Id.* Seventeen witnesses testified at the hearing. *Id.* Even though the trial court rejected the written report of the master without conducting an evidentiary hearing, it was held that the proper standard of review was the standard found in *Murphy*. *M.F.M.*, 889 S.W.2d at 949–50 (citing *Murphy*, 536 S.W.2d at 32). The decision of the trial court, therefore, will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or the decision erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32.

## FACTS

Prior to CCO's formation, Country Club purchased two of the nine properties that eventually made up the 345 acres that ultimately was CCO's sole asset. Country Club also had acquired rights to purchase the remaining seven parcels; it had a total of $855,000 in expenditures toward the purchase of the two parcels it had acquired and the rights on the remaining seven parcels. Immediately after CCO was formed, Van Tuyl contributed $1,000,000 to CCO. CCO distributed $855,000 of Van Tuyl's contribution to Country Club, which left $145,000 of the initial Van Tuyl contribution. Van Tuyl further provided to CCO $1,442,275.30, as evidenced by promissory notes, and $1,214,380.70, not evidenced by any promissory notes. Country Club formed two other entities entitled Donker, LLC ("Donker") and Branson National Golf, LLC ("Branson Golf") to effect the development and construction of a golf course. Although Defendants disputed that Donker and Branson Golf are creditors of CCO, they acknowledged that Donker and Branson Golf incurred expenses of at least $279,959.[4]

## POINTS ON APPEAL

For ease of discussion, we take the parties' points on appeal out of order. The trial court found that Country Club's initial capital contribution was $855,000. In its first point, Country Club appeals this finding and contends that its initial capital contribution should be valued at $3,857,500. Country Club argues that

---

3. All rule references are to Missouri Court Rules (2010), unless otherwise specified.

4. Donker and Branson Golf claim they incurred expenses in excess of $310,000.

CCO's Operating Agreement ("Operating Agreement") unambiguously identifies Country Club's initial capital contribution as the value of the real estate Country Club contributed to CCO and further defined the value of the real estate as Country Club's original acquisition purchase price of the property that Country Club contributed to CCO.

Country Club's first point turns on the meaning of the term "original acquisition purchase price" found in Article VIII, paragraph 2 of the Operating Agreement. Country Club argues "original acquisition purchase price" includes the value of the seven parcels it had acquired rights to while Defendants argue "original acquisition purchase price" means the actual out-of-pocket expenses Country Club incurred acquiring the two parcels and rights to purchase the remaining seven parcels. Therefore, Country Club claims its original acquisition purchase price was $3,857,500, whereas Defendants claim the original acquisition purchase price was $855,000.

■■■ "[A] contract is only ambiguous, and in need of a court's interpretation, if its terms are susceptible to honest and fair differences." *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 860 (Mo. banc 2006). Therefore, ambiguity in a contract does not arise simply because the parties to it dispute its construction. *Id.* The test to determine whether there is an ambiguity is whether, in the context of the entire agreement, the disputed language "is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person." *Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc.*, 171 S.W.3d 70, 73 (Mo.App. E.D.2005).

■■■ The term "original acquisition purchase price" as found in Article VIII, paragraph 2 of the Operating Agreement is not ambiguous. The plain meaning of Country Club's "original acquisition purchase price" is the amount Country Club incurred acquiring the property it initially contributed to CCO, which consisted of two parcels and rights to purchase the seven parcels making up the remainder of the 345 acres. This amount was $855,000. The trial court did not err in finding the purchase price to be $855,000. Country Club's first point is denied.

■■■ The trial court found that CCO was not liable to either Donker or Branson Golf for expenses Donker and Branson Golf incurred prior to the sale of CCO's property. Country Club's fourth point on appeal contends the trial court erred in finding that Country Club was not entitled to recover funds expended through entities it created, Donker and Branson Golf, for the purpose of attracting a developer to construct a golf course because Van Tuyl was "aware and informed" through his legal representative of the efforts of Donker and Branson Golf and "actively participated" in the preparation of contract documents on behalf of both entities, which "constitutes approval of those activities and resulting responsibility of CCO Investments for repayment of the expenses incurred." In the light most favorable to the judgment, we accept Defendants' contentions that CCO never obtained Van Tuyl's approval to pay the expenses incurred by Donker and Branson Golf and that Van Tuyl specifically told all parties that neither he nor CCO would participate in either Donker or Branson Golf. Van Tuyl was told at the time he entered the agreement that there were numerous developers ready to develop the golf course that were simply waiting for Country Club to find an entity that had the financial resources to purchase all of the properties. After we accept these facts, we then look

at the agreement of the parties to resolve this point.

Article VII, paragraph 4(B) of the Operating Agreement provides that:

Notwithstanding the provisions of paragraphs 2 and 3 of this Article VII, no action shall be taken or sum expended or obligation incurred by [CCO] or the Members with respect to a matter within the scope of any of the "Major Decisions" (as defined below) affecting [CCO], unless such Major Decision has been approved by Members holding at least 51% of the Sharing Ratios collectively held by all of the Members who are not then in default under any provision hereof. The "Major Decisions" shall be the following:

. . . .

(5) Obligate [CCO] to expenditures exceeding Five Thousand and No/100 Dollars ($5,000.00) whether by contract or otherwise, or make any expenditure exceeding Five Thousand and No/100 Dollars ($5,000.00).

This provision of the Operating Agreement requires expenditures exceeding $5,000 to be approved by "Members holding at least 51% of the Sharing Ratios collectively held by all of the Members[.]" As 70 percent owner of CCO, Van Tuyl was the majority owner of CCO, and all expenditures exceeding $5,000 had to be approved by him. The expenditures made by Donker and Branson Golf were not approved by the majority owner, Van Tuyl. Therefore, CCO was not obligated to reimburse those expenditures. Country Club's fourth point is denied.

With respect to Van Tuyl's initial $1,000,000 contribution, the trial court found that only $145,000 converted to a loan entitled to compound interest beginning December 31, 1997. Both parties appeal this finding. Thus, we address Country Club's second and third points on·

appeal, and Defendants' third point in their cross-appeal together as they are interrelated. Defendants assert that Van Tuyl's entire $1,000,000 initial contribution converted to a loan on December 31, 1997, whereas Country Club argues that none of Van Tuyl's initial contribution ever converted to a loan or, in the alternative, that if the $145,000 portion of Van Tuyl's initial $1,000,000 capital contribution did convert to a loan, the $145,000 was not entitled to compound interest.

The two key provisions of the Operating Agreement determinative to these points are Article IX, paragraph 9, and Article VIII, paragraph 3.

Article IX, paragraph 9, reads, in full:

9. **Initial Distribution**—As evidenced by the attached Exhibit A, [Van Tuyl] is contributing One Million and No/100 Dollars ($1,000,000.00) in cash as his initial equity contribution. Both [Country Club] and [Van Tuyl] acknowledge and agree that, notwithstanding anything to the contrary contained in this Company Agreement, [Country Club] and [Van Tuyl] will immediately cause [CCO] to distribute to [Country Club] the sum of Eight Hundred Fifty-five Thousand and No/100 Dollars ($855,000.00) representing a return of [Country Club's] initial cash outlay for the Country Club of the Ozarks project in the form of prior equity contributions and/or loans from the members of [Country Club] to [Country Club], all as listed on the attached Exhibit B. *In the event, [Van Tuyl's] initial One Million and No/100 Dollars ($1,000,000.00) capital contribution has not been distributed in full on or before December 31, 1997, the balance remaining shall be converted to a demand loan to [CCO] bearing interest at the same rate as the Line of*

Credit referenced in Article VIII, paragraph 3.

Article IX, paragraph 9 (emphasis added).

Article VIII, paragraph 3 reads, in full:

**3. Line of Credit**—Upon execution of this Company Agreement, [Van Tuyl] agrees to provide [CCO] with a line of credit in the amount of Five Million and No/100 Dollars ($5,000,000.00) *from a financial institution or other entity or person acceptable to [Country Club]* to be used to retire the indebtedness on [CCO] property, finance the remaining planned land acquisitions per Exhibit D, and future planned operations. [Van Tuyl] agrees to loan to [CCO] additional funds, at the same rate of interest, as may be necessary to pay the interest on said line of credit for the two year period beginning January 1, 1996 and ending December 31, 1997, if cash flow from operations is insufficient. From and after, January 1, 1998, [Country Club] and [Van Tuyl] will each be liable for their pro rata share (based on Sharing Ratios) of the interest on such line of credit. **All accrued but unpaid interest on [Van Tuyl] loans will compound annually.**

Article VIII, paragraph 3 (emphasis added).

Paragraph 9 of Article IX is entitled "Initial Distribution." The only distribution it specifically provides for is the $855,000 return to Country Club, paid out of Van Tuyl's initial $1,000,000 contribution. The paragraph further provides that "[i]n the event, [Van Tuyl's] initial One Million and No/100 Dollars ($1,000,000.00) capital contribution has not been distributed in full on or before December 31, 1997, the balance remaining shall be converted to a demand loan...." Defendants argue that the term "distributed" as used in Article IX, paragraph 9, means distributed to Van Tuyl, and that the entire $1,000,000 converted to a loan at the end of 1997. Country Club argues that the term "distributed" means "spent" and, therefore, no part of the $1,000,000 was converted to a loan because the entire $1,000,000 was spent by December 31, 1997.

 To aid in our determination, we first set out several maxims of contract law.

The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent. The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning. Additionally, each term of a contract is construed to avoid rendering other terms meaningless. A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense.

A contract is ambiguous only if its terms are susceptible to fair and honest differences. A contract is not ambiguous merely because the parties disagree as to its construction. Where the language of a contract is unambiguous, the intent of the parties is to be gathered from the contract alone, and a court will not resort to construction where the intent of the parties is expressed in clear, unambiguous language. Extrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity.

*Dunn Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 428–29 (Mo. banc 2003) (internal citations omitted).

 Whether a contract is ambiguous is a question of law that we review de novo. *Sherman v. Deihl,* 193 S.W.3d 863, 866 (Mo.App. S.D.2006). The test to determine whether there is an ambiguity is

whether, in the context of the entire agreement, the disputed language "is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person." *Klonoski,* 171 S.W.3d at 73. Parol evidence is permissible to aid in interpreting an ambiguous contract when it does not contradict, alter, or vary the contractual terms. *Sherman,* 193 S.W.3d at 866.

■ We find the provision in Article IX, paragraph 9 is not ambiguous as to what type of distribution would exclude a portion of the $1,000,000 from converting to a loan. The Operating Agreement defines "Distribution" as "[a] transfer of Property to a Member on account of a Membership Interest as described in Article IX." The plain language of the Operating Agreement indicates that Country Club was a member under the Operating Agreement and that $855,000 was distributed to Country Club as a "member" prior to December 31, 1997.[5] The entire $1,000,000 did not convert to a loan that entitled Van Tuyl to interest on the entire sum; however, substantial evidence supports the trial court finding that the remaining $145,000 was not distributed to a "member" on or before December 31, 1997, and, therefore, the balance became a loan as provided in Article IX, paragraph 9. The $145,000 was entitled to interest pursuant to the terms of Article IX, paragraph 9 that relate back to Article VIII, paragraph 3. The terms in Article VIII provide that "[a]ll accrued but unpaid interest on [Van Tuyl] loans will compound annually."

Although Country Club asserts that the provision in Article VIII, paragraph 3, only applied to loans made by Van Tuyl to CCO to pay interest due on a $5,000,000 line of credit that Van Tuyl was supposed to provide, we disagree. The plain language of Article IX indicates that any money that had not been distributed in full on or before December 31, 1997, would be converted to a demand loan to CCO bearing interest at the same rate as the line of credit referenced in Article VIII, paragraph 3. Country Club contends that no interest is due because no line of credit was ever established by Van Tuyl. The trial court found that Van Tuyl did not breach the contract by not establishing a line of credit. Country Club does not appeal that finding. The Operating Agreement does not state that a line of credit must be established before Article IX, paragraph 9 is valid. Article IX, paragraph 9 simply states that the remaining balance became a loan in the same manner as provided for in Article VIII, paragraph 3. Substantial evidence supports the trial court finding that CCO was entitled to compound interest on the $145,000. Country Club's second and third points, and Defendants' third point, are denied.

The trial court found that of the $2,656,656 provided by Van Tuyl, only $1,442,275.30 that was evidenced by four promissory notes was entitled to be treated as loans and that with respect to these loans, interest did not compound. In Defendants' first point, they claim the trial court erred in finding that the additional $1,214,380.70 provided by Van Tuyl to CCO that was not evidenced by separate promissory notes should not be treated as loans. In their second point, Defendants contend the $1,442,275.30 was entitled to compound interest under Article VIII,

5. We also agree with the finding of the special master that "it strains reason to conclude that the Operating Agreement would make the Majority Owner [of] CCO a creditor of the enterprise with no capital investment at all and the other member its debtor at the end of two years."

paragraph 3 of the Operating Agreement. Read together, Defendants' first and second points of their cross-appeal argue that the entire $2,656,656 Van Tuyl provided CCO with were loans entitled to compound interest. We affirm the trial court's conclusion that neither amount is entitled to compound interest; the $1,214,380.70 is not entitled to any interest, and the $1,442,275.30 is entitled to simple interest, consistent with the interest represented on the face of the promissory notes.

■ We first analyze whether $1,214,380.70, provided by Van Tuyl to CCO and not evidenced by promissory notes, was a loan entitled to interest. The trial court treated the sum as an additional capital contribution. Article I, paragraph 9 of the Operating Agreement defines "Capital Contribution" as "[a]ny contribution of Property, services or the obligation to contribute Property or services made by or on behalf of a Member or Assignee." In addition, Article I, paragraph 8, defines "Capital Account" as "[t]he account maintained for a Member ... determined in accordance with Article VIII." Pursuant to Article VIII, paragraph 2, entitled "Maintenance of Capital Accounts," CCO "shall establish and maintain Capital Accounts for each Member.... Each Member's Capital Account shall be increased by (1) the amount of any Money actually contributed by the Member to the capital of [CCO]." The trial court properly treated the $1,214,380.70 as additional capital contributions by Van Tuyl, per Article VIII, paragraph 2. Substantial evidence supports that determination; Defendants' first point is denied.

■ In their second point, Defendants contend the $1,442,275.30, which was evidenced by four promissory notes, was entitled to compound interest. We disagree. Under Article VI, paragraph 6.2, "[a] Member may lend money to and transact other business with [CCO]. The rights and obligations of a Member who lends money to or transacts business with [CCO] are the same as those of a person who is not a Member, subject to other applicable law." The promissory notes, on their face, did not indicate that they were entitled to compound interest. If a nonmember lent money to CCO evidenced by a promissory note that did not provide for compound interest, that nonmember would not be entitled to compound interest. We also note that the promissory notes do not make any reference to the Operating Agreement, in general, or to Article VIII, paragraph 3, in particular. Because Van Tuyl, as a member of CCO who lent money to CCO, holds "the same rights and obligations" as a nonmember lender, Van Tuyl is not entitled to compound interest on the $1,442,275.30 in funds provided to CCO as evidenced by promissory notes. Defendants' second point is denied.

In its judgment, the trial court dismissed "[a]ll other claims of the parties to this action inconsistent with or in any way asserting claims for any relief not otherwise granted by the terms of the Amended Report of the Special Master[.]" In its final point, Country Club argues the trial court erred in dismissing all other claims alleged by the parties following distribution of the proceeds, as identified within the judgment of the court. Specifically, Country Club contends its claim for breach of fiduciary duty and for punitive damages against Van Tuyl should not have been dismissed. Country Club's fifth point relied on reads, in full:

> The trial court erred in adopting the amended report of the special master and determining that all other claims of the parties should be dismissed after distribution of sale proceeds as identified within the judgment of the court, including, but not limited to, the claims

of Country Club of the Ozarks, LLC, for breach of fiduciary duty and for exemplary or punitive damages . . . there was no fact finding, determination of facts supporting, or not, the claim for breach of fiduciary duty asserted by Country Club of the Ozarks, LLC, and no waiver of the claim for breach of fiduciary duty asserted by Country Club of the Ozarks, LLC had ever been provided to the court and the dismissal of the same upon adoption of the amended report of the special master was improper *in that* the trial court was not authorized to make a determination of a claim upon which it made no findings, no evidence had been presented, no trial was had, and no waiver of such claim for recovery of damages attributable to breach of fiduciary duty, and potentially for recovery of punitive damages asserted could have been determined by the court without either presentation of evidence, trial or waiver of such claims.

We read this point to be a complaint that the trial court made a determination on claims upon which there were no findings or evidence presented. A special master was ordered to submit a report "with written recommendations for resolution of **all** accounting issues in dispute, **legal issues, issues of fact** which are subject to **genuine controversy and dispute between the parties,** and such other matters as the special master may deem appropriate for effective resolution of the **issues**[.]" (emphasis added). The special master carefully did so when he determined "twelve specific issues" that the parties agreed that the special master should decide, and the trial court adopted those findings. As noted, the trial court's judgment dismissed "[a]ll other claims of all the parties to this action inconsistent with or in any way asserting claims for any relief not otherwise granted by the terms of the Amended Report of the Special Master[.]"

Pursuant to Rule 73.01(c), a party may request specific findings of fact from the court.

If a party so requests, the court shall dictate to the court reporter or prepare and file a brief opinion containing a statement of the grounds for its decision and the method of deciding any damages awarded.

The court may, or if requested by a party shall, include in the opinion findings on the controverted fact issues specified by the party. Any request for an opinion or findings of fact shall be made on the record before the introduction of evidence at trial or at such later time as the court may allow.

All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached.

Rule 73.01(c).

 "[I]t is the parties' duty to specifically request findings of fact and conclusions of law, identifying the issues they wish the court to decide." *Hammons v. Ehney,* 924 S.W.2d 843, 849 (Mo. banc 1996). Furthermore, "if the trial court fails to comply with a request" for findings of fact and conclusions of law, ordinarily "the case is remanded for production of findings. Only if there is enough evidence on the record to support the trial court's decision may an appellate court *affirm* without remand." *Id.* at 850 (emphasis in original).

 Neither brief submitted by Country Club provides a citation to the record indicating Country Club made a valid request for findings on a specific fact issue that was not made, as required by Rule 84.04(i). The law cited in Country Club's argument portions of its briefs regarding its point address only the elements of a breach of fiduciary duty claim and the proper statute of limitations applicable to

such a claim. Country Club does not direct us to any part of the record where it requested additional evidence be taken on a claim for a breach of fiduciary duty or a request for specific findings concerning the breach of a fiduciary duty or punitive damages claims. Our review found no such request. The court made sufficient findings of fact to dispose of all claims in Country Club's suit and enough evidence exists in the record to support the trial court's decision.

Furthermore, even if Country Club requested specific findings, Country Club's argument that the trial court erred by entering judgment without making specific findings of fact is not preserved for our review. Rule 78.07(c) provides: "In all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review." Country Club failed to file any post-trial motions, including a motion to amend the judgment. As such, the complaint that the trial court entered judgment without making specific findings of fact is waived. *See Coffman v. Coffman*, 300 S.W.3d 267, 273 (Mo.App. W.D.2009) ("Rule 78.07(c) requires that allegations of error relating to the language of the judgment … must be raised in a motion to amend the judgment to be preserved for appellate review. The broad language of Rule 78.07(c) encompasses complaints regarding required findings whether mandated by statute or Supreme Court Rule.") (internal citations omitted). Country Club's final point is denied.

The judgment is affirmed.

SCOTT, C.J., BATES, J., concur.