Gale Ann TESTERMAN, Respondent,

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI, Appellant.**

No. WD 58036.

Missouri Court of Appeals,
Western District.

Nov. 7, 2000.

James O. Kjar, Warsaw, for respondent.

Jeremiah W. (Jay) Nixon, Atty. Gen., James A. Chenault, III, Sp. Asst. Atty. Gen., Jefferson City, for appellant.

Before EDWIN H. SMITH, P.J., and ULRICH and ELLIS, JJ.

EDWIN H. SMITH, Presiding Judge.

The Director of Revenue (Director) appeals from the judgment of the circuit court reinstating the driver's license of the respondent, Gale Ann Testerman, after it had been administratively suspended by the Director for the respondent's driving with a blood alcohol concentration (BAC) of .10% or more, pursuant to § 302.505.1 .[1]

In his sole point on appeal, the Director claims that the trial court erred in reinstating the respondent's driver's license because he made a *prima facie* case for suspension under § 302.505.1, which was not rebutted by the respondent.

We reverse and remand.

1. All statutory references are to RSMo Supp. 1997, unless otherwise indicated.

## Facts

On February 21, 1999, Officer Rodney Bonner of the Warsaw Police Department observed the respondent drive her truck across the center line of an outer road in Warsaw, Missouri. In response, he activated his patrol lights and stopped the respondent's vehicle. After approaching the vehicle to issue a citation, the officer smelled the odor of intoxicants coming from the vehicle. Under questioning by Officer Bonner, the respondent admitted that she had been drinking. As a result, Officer Bonner administered three field sobriety tests which, in his opinion, the respondent failed. Officer Bonner placed the respondent under arrest for DWI, put her in his patrol car, and transported her to the Benton County Sheriff's Department. At the Sheriff's Department, the respondent was given a breathalyzer test by Officer James Cihy of the Warsaw Police Department. The test indicated that the respondent had a BAC of .204.

After her arrest, the Director notified the respondent that her driver's license was suspended pursuant to § 302.505. Pursuant to § 302.530, the respondent requested administrative review of her suspension, which was upheld. Subsequently, on May 28, 1999, pursuant to § 302.535.1, the respondent filed a petition for trial *de novo* in the Circuit Court of Benton County. The Honorable Larry M. Burditt heard the petition on August 5, 1999. At the close of all of the evidence, the trial court took the respondent's case under advisement.

On November 12, 1999, the trial court entered its judgment reinstating the respondent's license, finding that the respondent "did place [an] object in her mouth during the period fifteen minutes immediately prior to taking the test."

This appeal follows.

## Standard of Review

Our review of the trial court's judgment reinstating the license of the respondent, after it had been suspended under § 302.505.1 for driving with a BAC of .10% or more, is the same as in any other judge-tried case and is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. *banc* 1976). *Endsley v. Dir. of Revenue*, 6 S.W.3d 153, 157 (Mo.App.1999). "As such, we must affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.*

## I.

In his sole point on appeal, the Director claims that the trial court erred in reinstating the respondent's driver's license because he made a *prima facie* case for suspension under § 302.505.1, which was not rebutted by the respondent.[2] We agree.

Section 302.505.1 provides, in pertinent part:

> The department shall suspend or revoke the license of any person upon its determination that the person was arrested upon probable cause to believe such person was driving a motor vehicle while the alcohol concentration in the person's blood, breath, or urine was ten-hundredths of one percent or more by weight, based on the definition of alcohol concentration in section 302.500. . . .

Accordingly, under this statute, the Director makes a *prima facie* case for suspending or revoking a driver's license by establishing by a preponderance of the evidence that: "(1) there was probable cause to arrest the driver for DWI, and (2) at the time of the arrest, the driver's BAC was at least ten-hundredths of one percent or more by weight." *Endsley*, 6 S.W.3d at 158 (*citing Barrett v. Dir. of Revenue*, 963 S.W.2d 717, 719 (Mo.App.1998)). Once the Director has made a *prima facie* case, the

2. The respondent did not file a brief on appeal.

burden then shifts to the driver to present evidence to rebut it by a preponderance of the evidence. *Id.* (*citing Hurley v. Dir. of Revenue*, 982 S.W.2d 694, 696 (Mo.App. 1998)). Thus, in deciding this appeal, we must first determine whether the evidence was sufficient for the Director to have made a *prima facie* case for suspension; and, if it was, whether the respondent rebutted the same.

### A. Sufficiency of Evidence to Establish *Prima Facie* Case to Suspend

#### 1. Probable Cause to Arrest

■ As stated, *supra,* to make a *prima facie* case for suspension, the Director first had to show by a preponderance of the evidence that there was probable cause to arrest the respondent for DWI. Probable cause to arrest for DWI for purposes of § 302.505 "exists when the facts and circumstances would warrant a person of reasonable caution to believe that an offense has been or is being committed." *Smith v. Dir. of Revenue*, 13 S.W.3d 700, 705 (Mo. App.2000) (citations omitted). "Thus, whether probable cause existed to arrest the respondent is determined 'in relation to the circumstances as they would have appeared to a prudent, cautious, and trained police officer.'" *Id.* (citations omitted).

■ At the suspension hearing, the respondent did not dispute that there was probable cause to arrest her for DWI. The record reflects that she was stopped by Officer Bonner for driving her truck across the center line. While talking with her after the stop, he smelled the odor of alcohol coming from her vehicle. Upon inquiry by the officer, the respondent admitted that she had been drinking that evening. As a consequence, Officer Bonner administered three field sobriety tests which, in his opinion, she failed. "This court has previously held that probable cause for arrest for driving while intoxicated exists where an officer stops a vehicle for a traffic violation, ... detects the odor of alcohol on the driver's breath, the driver admits to drinking, and fails one or more field sobriety tests." *Terry v. Dir. of Revenue*, 14 S.W.3d 722, 724 (Mo.App.2000) (citations omitted). Thus, we find that the evidence was sufficient to establish probable cause for the arrest of the respondent for DWI, satisfying the first element of the Director's *prima facie* case for suspension under § 302.505.1. *Smith*, 13 S.W.3d at 705 (citation omitted).

Having determined that the Director met his burden to establish probable cause for the respondent's arrest for DWI, we turn to the issue of whether he met his burden of establishing that she was driving with a BAC of .10% or more.

#### 2. BAC of .10% or More

In order to satisfy the second element of his *prima facie* case for suspending the respondent's driver's license, that she was driving with a BAC of .10% or more, the Director sought to introduce the result of her Breathalyzer test (BTR). *See* § 577.037 (authorizing admission of a BTR in proceedings for license suspension or revocation "pursuant to the provisions of chapter 302, RSMo"). At trial, the respondent objected to its introduction on the basis that the Director had not laid a proper foundation for its admission in that he was required, but failed, to show that a maintenance check had been conducted in accordance with applicable Missouri Department of Health (MDH) regulations regarding the DataMaster used to determine the respondent's BAC. Specifically, the respondent asserted that the required maintenance check was deficient in that the maintenance officer was required, but failed, to indicate on the maintenance report the exact simulator temperature. The record reflects that the trial court initially overruled the respondent's improper foundation objection and allowed Officer Cihy to testify as to the respondent's BTR. However, when, at the close of his case, the Director offered for admission the maintenance report, certificate of

analysis, operational checklist, and BAC printout, the respondent renewed her objection, which the court stated for the record it was taking "with the case." After the Director had concluded his case, the respondent testified in her case, *inter alia,* that it was possible she had a peppermint in her mouth during the fifteen minutes immediately prior to her taking the Breathalyzer test.

In his closing argument, respondent's counsel made two arguments as to why the respondent's driver's license should be reinstated. First, counsel argued that the respondent's BTR was inadmissible because the Director failed to show that a proper maintenance check had been conducted on the DataMaster used in that the exact simulator temperature had not been determined by and noted by the maintenance officer on the maintenance report. Second, counsel argued that, even if the respondent's BTR was admissible such that the Director made a *prima facie* case for suspension, the same was rebutted in that the respondent's evidence established that she had a peppermint in her mouth during the fifteen minutes immediately preceding her breathalyzer test such that her BTR was rendered inadmissible.

The trial court entered its judgment on November 12, 1999,[3] ordering the Director to reinstate the respondent's license, which read:

> Court again considers matter finds that the defendant did place on [*sic* ] object in her mouth during the period fifteen minutes immediately prior to taking the test. So ordered to remove suspension from the petitioners [*sic* ] operating privalege [*sic* ] based on events of 2/22/99.

From the trial court's judgment entry it is apparent that its reinstatement of the respondent's driver's license was based on its finding and conclusion that the respondent had rebutted the Director's *prima facie* case for suspension. Specifically, the court found and concluded that the respondent had rebutted the requisite BAC element of the Director's *prima facie* case in that the court believed her testimony that during the required fifteen-minute observation period, she had a peppermint in her mouth such that the Director had failed to lay a proper foundation for the admission of her BTR.

■ Because this was a judge-tried case in which neither party requested findings of fact and conclusions of law pursuant to Rule 73.01(a)(3),[4] the court's stated finding and conclusion for its judgment were gratuitous only.[5] *M.F.M. v. J.O.M.,* 889 S.W.2d 944, 954 (Mo.App.1995). In a judge-tried case, our review is not limited to determining whether the trial court's judgment was correct based solely on its gratuitous findings and conclusions. *Id.* Rather, because we are primarily concerned with whether the result reached by the trial court was correct, not necessarily the course taken to reach it, we will not only affirm the judgment of the court if it was correct on the basis or theory gratuitously found by the court, but on any reasonable theory supported by substantial evidence. *Id.; see also Graves v. Stewart,* 642 S.W.2d 649, 651 (Mo. *banc* 1982); *Farmer's Mut. Fire Ins. Co. v.. Farmer,* 795 S.W.2d 104, 105 (Mo.App. 1990). In conducting such a review, "[a]ll fact issues upon which no specific findings are made shall be considered as having

---

**3.** The record reflects that the trial court entered an "order" on August 17, 1999, reinstating the respondent's license. Because the court's entry was not designated a judgment, as required by Rule 74.01(a) (1999) for a valid, appealable judgment, the Director moved to amend. Accordingly, on November 12, 1999, the court amended its entry, denominating its order reinstating the respondent's license as a "judgment."

**4.** All rule references are to Missouri Rules of Civil Procedure (1999), unless otherwise indicated.

**5.** Although denominated "gratuitous" from a legal standpoint, we encourage and appreciate such findings and conclusions by the trial court. Many times they are invaluable to our discussion and disposition.

been found in accordance with the result reached." Rule 73.01(a)(3).

In our case, although the trial court's judgment was obviously based on only one theory of the case, it conceivably could be argued that there existed two bases on which the trial court would have been justified in ordering the reinstatement of the respondent's driver's license, which were asserted by her at her suspension hearing: (1) that the Director failed to make a *prima facie* case for suspension because he failed to show that the respondent had a BAC of .10% or more in that her BTR was rendered inadmissible due to the maintenance officer's failure to determine and specify in his report the exact simulator temperature of the DataMaster; and (2) if the Director did make a *prima facie* case, the same was rebutted in that the respondent's evidence, if believed, established that she had a peppermint in her mouth during the fifteen-minute observation period, such that her BTR was rendered inadmissible and thus the Director failed to establish that she had a BAC of .10% or more. Logically, before addressing the second issue of whether the Director's *prima facie* case was rebutted, we must first address whether the Director did, in fact, make a *prima facie* case for suspension by laying a proper foundation for the admission of the respondent's BTR.

 In order to establish a proper foundation for the admission of the result of a breathalyzer test to satisfy the BAC requirement of § 302.505, the Director must show that: (1) the test was performed by following the techniques and methods approved by the MDH, (2) by licensed medical personnel or by a person possessing a valid permit, and (3) using equipment and devices approved by the MDH. §§ 577.020.3–4; 577.026, RSMo

1994; *Endsley*, 6 S.W.3d at 159. The MDH regulations governing the administration of breath tests are found in 19 C.S.R. 25–30.011—25–30.080. As to the third requirement, if a timely objection is made to the admission of the BTR, the Director must show that a maintenance check of the breathalyzer machine used had been conducted by a Type II permit holder within 35 days of the date on which the test was administered, as required by 19 C.S.R. 25–30.031(3). *Endsley*, 6 S.W.3d at 159 (*citing Lasley v. Dir. of Revenue*, 954 S.W.2d 327, 331 (Mo. *banc* 1997)). "The regulations regarding the maintenance checks dictate that compliance is mandatory." *Endsley*, 6 S.W.3d at 159 (*citing Turcotte v. Dir. of Revenue*, 829 S.W.2d 494, 496 (Mo.App.1992)); *see* 19 C.S.R. 25–30.031(3).

Here, to establish the requisite foundation for the admission of the respondent's BTR, the Director relied on the testimony of Officer Cihy, who administered the breathalyzer test, and on the testimony of Corporal Frisbie, who conducted the maintenance check on the DataMaster used by Officer Cihy.[6] Officer Cihy testified to the requisite foundational elements for admission of the respondent's BTR, including that the respondent did not have anything in her mouth during the observation period. However, the respondent objected to the admission of her BTR, claiming that the required maintenance check was not properly performed. *See* 19 C.S.R. 25–30.031(7)(c) (directing that the required maintenance check of the DataMaster be done in accordance with "Report No. 6," entitled the "DataMaster Maintenance Report" (DMR)). In objecting to the admission of her BTR, the respondent asserted that the required maintenance check was deficient in that, although the maintenance

6. The record reflects that the Director actually called Corporal Frisbie as his first witness to testify regarding the maintenance check that was performed. At the time, the respondent's breathalyzer test result had not yet been offered or objected to, such that it was unknown whether the introduction of evidence concerning the maintenance check was even necessary for the introduction of the respondent's test result. In any event, the respondent ultimately did object, triggering the necessity of such evidence in order for the Director to lay a proper foundation for its introduction.

officer checked the box provided on the prescribed "DataMaster Maintenance Report" form, indicating that he had checked the simulator temperature and found it to be within the allowed range, he did not indicate the specific simulator temperature as the respondent argued was required by the express instructional language of the form. In contending that the maintenance check was deficient so as to render her BTR inadmissible, the respondent argued that the maintenance report form *required* the maintenance officer, as part of his maintenance check, to determine and specify on the report the exact simulator temperature, but that he failed to do so. From this, she essentially argued at the hearing that the trial court should conclude that the maintenance officer did not check the simulator temperature as required, such that the requisite foundation was not laid for the admission of her BTR.

In *Endsley v. Dir. of Revenue, supra,* this court held that the trial court, in ordering the reinstatement of the appellant's driver's license, could, despite the maintenance officer's testimony to the contrary, reasonably infer and believe from his failure to check the box provided on the maintenance report form, indicating that the simulator temperature was within the allowed limits, that he had failed to do this maintenance step as required, such that the court was justified in finding that the driver's BTR was inadmissible to establish the BAC element of the Director's *prima facie* case for suspension. 6 S.W.3d at 166. The rationale for our decision in *Endsley* was that, because the maintenance report form instructed the maintenance officer to check the boxes provided to indicate that the mandatory maintenance steps had been performed, it was reasonable to infer from his failure to check a required box that he had failed to perform the corresponding step, despite the officer's testimony to the contrary, which the trial court was free to believe or disbelieve. In our case, however, the box as to whether the simulator temperature was within the allowed range was checked,

indicating that this step was performed. Nonetheless, the rationale of *Endsley* would still apply, but only if the respondent was correct in her assertion that the maintenance officer was not only required to determine that the simulator temperature was within the allowed limits and check the corresponding box, but was also required to determine and indicate on the maintenance report the exact simulator temperature.

 We can find no authority requiring the maintenance officer to indicate on the "DataMaster Maintenance Report" form the specific simulator temperature, as argued by the respondent below. At trial, the record reflects that the sole basis for the respondent's argument was the checklist instructions of the maintenance report form, which read:

> CHECKLIST: Place a check (√) to the left of each item if found to be satisfactory or if operating within established limits. (*Write in observed values where determined.*) Unchecked items must be corrected before using instrument.

DMR (emphasis added). In reading in isolation the general instructional language requiring the maintenance officer to "[w]rite in observed values where determined," we would agree that an argument could be made that he was required to indicate the exact simulator temperature on the form. However, the applicable MDH regulations do not require the maintenance officer to indicate a specific simulator temperature; rather, they only require that the simulator temperature be within the allowed limits as indicated on the report form. 19 C.S.R. 25–30.031. Moreover, in looking at the specific maintenance steps on the form, it becomes readily apparent which steps require a specific value to be written in and which do not. For example, the maintenance form requires the maintenance officer to determine the temperature of the "Heaters Sample Chamber." A corresponding box is provided which the officer is to check to

indicate that this step has been performed. In addition, as to this step, the form provides a blank for the officer to indicate the exact temperature: "Heaters Sample Chamber _____ °C." DMR. No such blank is provided on the form, however, for the officer's determination of the simulator temperature: "Simulator Temperature (34°C ± .2C̃)," indicating that all that is required of the officer with respect to this maintenance step is that the officer determine that the simulator temperature is within the allowed range. DMR.

Because we find that the maintenance officer in this case was not required to indicate the exact simulator temperature in his maintenance report, but only that it was within the allowed range, in keeping with the rationale of *Endsley*, it would be unreasonable to allow the trial court to infer from the officer's failure to gratuitously include this information that he had failed to perform a "required" maintenance step, such that the respondent's BTR was rendered inadmissible. Hence, the Director's evidence, viewed alone, supported the admissibility of the respondent's BTR and the conclusion that the Director made a *prima facie* case for suspension. The question remains, however, whether the evidence was sufficient for the court to find that the same was rebutted in that the respondent had a peppermint in her mouth during the required observation period.

**B. Sufficiency of Evidence to Rebut Director's *Prima Facie* Case**

 Once the Director made a *prima facie* case for suspension, the burden shifted to the respondent to rebut the same by a preponderance of the evidence. *Hurley*, 982 S.W.2d at 696. To rebut a *prima facie* case for suspension or revocation under § 302.505, the driver is required to present specific evidence; merely pointing out inconsistencies in the Director's case is not sufficient. *Id.* at 696–97; *Anderson v. Dir. of Revenue*, 969 S.W.2d 899, 903 (Mo.App. 1998).

 As discussed, *supra*, to rebut the Director's *prima facie* case, specifically the BAC element, the respondent presented evidence at trial from which her counsel argued that the trial court could reasonably infer that she had a peppermint in her mouth during the required observation period such that her BTR should not have been admitted for a lack of foundation. Based on the trial court's judgment entry, it is clear that the court accepted the respondent's argument. The Director, however, contends that the evidence was insufficient for the trial court to find that she had anything in her mouth during this critical time. We agree.

Pursuant to 19 C.S.R. 25–30.060(3), (7) and MDH Form #7, a driver submitting to a breathalyzer test must be observed for fifteen minutes prior to taking the test to ensure that he or she does not smoke, vomit, or place *anything* into her mouth. *Hill v. Dir. of Revenue*, 985 S.W.2d 824, 828 (Mo.App.1998). One purpose of "the observation period is to give any alcohol or substance that might be in the person's mouth time to dissipate thereby ensuring an accurate lung sample as opposed to an inaccurate mouth sample." *Hill*, 985 S.W.2d at 828. Compliance with the observation period is one of the foundational requirements for the introduction of a BTR into evidence. *Id.* at 829.

As to the observation period requirement, the record reflects that the Director introduced the following testimony from the arresting officer, Officer Bonner, on direct examination:

A. I placed her in the patrol car and transported her to the police station, and—

. . .

Q. Was that for the purpose of giving a breath test?

A. Yes, it was.

Q. And what happened when you got to the Benton County Sheriff's Department?

A. We went to the back room, and I—Corporal Cihy come [*sic* ] to the police station to do the BA machine because I'm not certified on that, and I asked her the questions.

Q. Okay. Did you observe Ms. Testerman up until the moment she took a breath test?

A. Yes, I did.

Q. Had she smoked, vomited, or had any kind of oral intake while you were observing her?

A. Not that I could see.

Q. Okay. And did you observe—have the opportunity to observe her for the period of at least the 15 minutes—

A. Yes, I did.

Under cross-examination by the respondent, Officer Bonner further testified on this issue:

Q. Officer Bonner, Ms. Testerman, was she in your custody and control from the time of this traffic stop—

A. Yes.

Q. —until she performed the breath alcohol test?

A. Yes. Yes, she was.

Q. During any of that time was she ever out of your line of sight?

A. No, not that I can remember.

Q. When you were—Was she placed in your patrol car?

A. Yes, she was.

Q. Was she handcuffed?

A. No, she was not.

Q. Did she have her purse with her?

A. I don't recall.

Q. As she was placed into your patrol car, did you go around the rear of your patrol car, then, to get in it?

A. No. I went to the front of my patrol car to get in it.

Q. Were you looking inside the front of your patrol car while you were walking around the front of it?

A. I don't recall.

Q. Did Ms. Testerman ever make any statements to you about placing anything in her mouth, to your recollection?

A. No, she did not.

Q. Did you have Ms. Testerman open her mouth, and did you physically observe if there was anything in her mouth?

A. No, I did not.

Q. Is there a possibility there was something in her mouth?

A. No, not that I'm—not that I'm aware of. I guess there's always a possibility.

On redirect, Officer Bonner testified:

Q. Did you make any—Did you observe her at any time to be chewing or swallowing or anything that would make you think she had put something in her mouth?

A. No.

If believed, this evidence of the Director was sufficient for the trial court to find that the respondent did not have any oral intake within the fifteen minutes immediately preceding her breathalyzer test. However, in determining whether the respondent rebutted the Director's *prima facie* case, the trial court was free to disregard this evidence and believe the respondent's evidence on this issue, *Endsley*, 6 S.W.3d at 161, which it obviously did, given its judgment. As such, the issue in question does not turn on credibility, but whether the evidence was such that the trial court could have reasonably inferred, as it did, that the respondent had a peppermint in her mouth during the fifteen-minute observation period, which rendered her BTR inadmissible.

As to the respondent's evidence on the issue of whether she had a peppermint in her mouth during the observation period, she testified on direct examination by her attorney:

Q. Okay. After he said he was going to place you under arrest, what did you—what did he do?

A. I—What I remember is I took my purse and my keys from my vehicle.

Q. Okay. And where did you go from that point?

A. Into a police car.

Q. Okay. What, if anything, did you do after you took a seat in that police car to the best of your recollection?

A. I don't remember anything specific, just—

Q. At any point subsequent to the time you were stopped with Mr. Bonner, did you take into your mouth any sort of objects of any sort?

A. Yes, a peppermint.

Q. Okay. When did you place this into your mouth?

A. I don't recall exactly when. I do it often, so I don't recall exactly when I did that.

Q. When you were stopped by Officer Bonner, did you have something in your mouth?

A. No, I don't remember having anything. It had to have been after I took my purse out of my vehicle.

Q. Okay. So you placed this into your mouth. What—When you say a peppermint, what exactly are you referring to?

A. Peppermint candy.

Q. Okay. Did you ever spit this out of your mouth?

A. No, I don't remember spitting it out. I usually chew it up and swallow it.

Q. Okay. When you were transported to the police station, was this still in your mouth at that time?

A. I don't recall exactly when. I just know I did. So—

Q. Do you remember still having this candy in your mouth when you were being questioned by Officer Bonner?

A. I don't remember if I had it in my mouth when I was talking or not. I don't remember exactly when I had it in my mouth. I just know I told him that I had a peppermint when he asked me—

or told me that I was going to have to take the breathalyzer test.

Q. Okay. Did you tell him—What did you tell him at that time?

A. I told him I had had a piece of peppermint in my mouth.

Q. Okay. Did he seem concerned by that whatsoever?

A. No. I don't remember any comment being made.

Q. Okay. Did 15 minutes pass from the time you had completed eating this candy until such time as you blew into the breath machine?

A. I have no idea. I don't wear a watch. I didn't pay attention at the time.

MR. KJAR: Okay. No further questions, Your Honor.

THE COURT: Mr. Crosby?

MR. CROSBY: Thank you, Your Honor.

On cross-examination by the Director, the respondent testified:

Q. Now, when you put the—this peppermint in your mouth, was that just—you said it was kind of like a habit?

A. I do it often from—I have stomach problems, and it seems to relieve the problems that I have.

Q. Did you have—Did you feel like nausea or something like—

A. No. I have stomach—severe stomach pains since I've had a surgery, and that peppermint seems to relieve some of the pressure or the pain.

Q. Okay. But you seem—But you seem to think you did it—you put this in your mouth at some point in the police car?

A. I don't remember. I know it had to have been after I removed my purse from my vehicle and before I took the testing. Because I remember telling him specifically.

Q. And you did it—You did this for—just because you had stomach pains?

A. Yes. I take peppermint for that reason, yes.

Q. Okay. You weren't—So there would have been no reason for you to try and hide the fact that you had a peppermint from the police officer?

A. No.

Q. Okay. So if the officer was looking at you and doesn't see you chewing or anything like that, probably at that point you would have swallowed it?

A. That or I'd just suck on it. So—

Q. You did testify that you usually chew them?

A. Well, towards the end I will, you know. Not always.

Q. And you're not sure at what point you were—You're not sure at what point this peppermint had been completely eaten?

A. No, sir.

As to the respondent's testimony, the Director contends that, even if believed, the trial court could not reasonably infer therefrom that the respondent did, in fact, have a peppermint in her mouth during the observation period. We agree.

A careful review of the respondent's testimony discloses that she did not testify as to the specific time when she placed the peppermint in her mouth or how long it remained there. As such, to determine that she had a peppermint in her mouth during the observation period, the court would have had to rely on the reasonable inferences from the evidence presented. Although the trial court in a civil case is free to rely on inferences from the evidence in determining whether a party has met its burden of proof, they must be reasonable in nature, and the trial court cannot rely on guesswork, conjecture and speculation. *Herberholt v. dePaul Cmty. Health Center*, 625 S.W.2d 617, 623 (Mo. banc 1981). In a civil case:

the shown circumstances must be such that the facts necessary to support the finding may be inferred and reasonably must follow, that the existence of such facts may not depend upon guesswork, conjecture and speculation, and that the evidence should have a tendency to exclude every reasonable conclusion other than the one desired. Although an inference need not be justified beyond all doubt and is not precluded by a mere possibility that the contrary may be true, the law does not contenance [*sic* ] the drawing of forced and violent inferences which do not arise from a reasonable interpretation of the facts actually shown. . . .

*Id.* (citations omitted). In this regard, the record favorable to the trial court's judgment would indicate that the respondent was stopped at 1:36 a.m., arrested at 1:46 a.m., asked for her consent to submit to a breathalyzer test at 1:58 a.m., and given the breathalyzer test at 2:17 a.m. At best, when viewed in a light most favorable to the respondent, the evidence would support the fact that sometime between 1:46 and 1:58 a.m. the respondent placed a peppermint in her mouth and that it was still there at 1:58 a.m., when Officer Bonner asked her whether she would consent to taking a breathalyzer test. However, without engaging in pure speculation, there is no way to determine whether the mint was still in her mouth during the observation period, 2:02 a.m. to 2:17 a.m. The respondent did not testify that the mint was still in her mouth during this time nor did she testify as to basic underlying facts which would have allowed the trial court to reasonably infer that it was still there, such as how big the mint was or the average time it took her to finish one. Thus, in concluding that the Director's *prima facie* case for suspension under § 302.505.1 had been rebutted by the fact that the respondent had a peppermint in her mouth during the observation period, the trial court clearly had to resort to an inference that was unreasonable in that it relied on speculation, which it could not do. *Riley v. Riley*, 847 S.W.2d 86, 88 (Mo.App. 1992); *Boatmen's Bank of Butler v. Berwald*, 752 S.W.2d 829, 833 (Mo.App.1988).

Hence, the trial court's judgment reinstating the respondent's driver's license based on the respondent's rebutting of the Director's *prima facie* case was in error.

## Conclusion

The judgment of the circuit court reinstating the respondent's driver's license is reversed and the case remanded for the court to enter its judgment affirming the Director's suspension of the respondent's license, pursuant to § 302.505.1.

ULRICH and ELLIS, JJ., concur.