**Michael COYLE, Respondent,**

v.

**DIRECTOR OF REVENUE, Appellant.**

**No. WD 60476.**

Missouri Court of Appeals, Western District.

Nov. 19, 2002.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, MO, Kimberley R. Fournier, Assistant Attorney General, Kansas City, MO, for Appellant.

Jeffrey S. Eastman, Gladstone, MO, for Respondent.

Before BRECKENRIDGE, P.J., and HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

After the Director of the Department of Revenue suspended his driver's license for driving with an excessive blood-alcohol content (BAC) pursuant to § 302.505.1,[1] Michael Coyle petitioned the Platte County Circuit Court for a trial de novo pursuant to § 302.535. At the trial de novo, Mr. Coyle objected to the admission of his BAC test result because an unauthorized software change had previously been made to the DataMaster breathalyzer used to test his BAC. The court sustained the objection and refused to admit Mr. Coyle's BAC test result. At the close of the Di-

rector's case, Mr. Coyle moved to set aside the suspension because the Director had not met his burden of proving that Mr. Coyle's BAC was greater than .10 percent. The court sustained his motion and set aside the suspension.

On appeal, the Director maintains that the trial court erred in refusing to admit the BAC test result because he laid a proper foundation for admission of Mr. Coyle's BAC. Thus, the Director argues that he established a prima facie case, which Mr. Coyle failed to rebut, so the suspension of Mr. Coyle's driving privileges should have been upheld.

We agree that the Director laid a proper foundation for admission of Mr. Coyle's BAC test result. Since his BAC was not in evidence at trial, Mr. Coyle did not present any evidence at trial to rebut the Director's prima facie case. Therefore, we reverse the trial court's judgment and remand for further proceedings.

## Background

When viewed in a light most favorable to the trial court's judgment, the evidence presented at the de novo hearing on Mr. Coyle's driver's license suspension showed as follows:

On October 8, 2000, Trooper David Brenton of the Missouri State Highway Patrol stopped Mr. Coyle's vehicle when he observed it entering the highway at Gateway and Riverway Roads in Platte County, Missouri, after dark without the headlights on. Trooper Brenton requested that Mr. Coyle step back to his patrol car. Once Mr. Coyle was inside his patrol car, Trooper Brenton detected a "moderate odor of intoxicating beverage about his person" and noted Mr. Coyle's bloodshot eyes and dilated pupils. Trooper Brenton then administered field sobriety tests,

1. Statutory references are to Revised Statutes of Missouri 2000.

which Mr. Coyle performed "poorly" on, and a preliminary breath test, which confirmed the presence of alcohol. As a result, Trooper Brenton placed Mr. Coyle under arrest and transported him to the police station. At the station, a BAC test was performed on a DataMaster that showed Mr. Coyle's BAC to be .137.

The Director subsequently suspended Mr. Coyle's driver's license pursuant to § 302.505.1. Mr. Coyle timely requested and received an administrative hearing on the suspension. After the administrative law judge affirmed the suspension, Mr. Coyle petitioned for de novo review of the suspension in Platte County Circuit Court, as permitted under § 302.535.

At the hearing on Mr. Coyle's petition for de novo review of the suspension, the Director attempted to introduce the result of Mr. Coyle's BAC test as part of his "Exhibit A." Captain Thomas Archibald testified concerning the maintenance performed on the "BAC DataMaster" used to test Mr. Coyle's BAC. Captain Archibald testified that he held a valid, "Type II" permit under 19 CSR 25–30.031 that mandated him to perform maintenance checks on the DataMaster breath analyzer machine every thirty-five days. He verified that he had made the necessary maintenance check on the machine used to check Mr. Coyle's BAC on October 1, 2000, just seven days prior to Mr. Coyle's arrest. He explained that he followed, without deviation, the mandated checklist in maintaining the machine, and he found the DataMaster to be "functioning within the Department of Health guidelines."

Upon cross-examination, Mr. Coyle's counsel questioned Captain Archibald about the installment of a new software chip in the DataMaster in April or May of 2000. The following exchange took place between Mr. Coyle's counsel and Captain Archibald:

Q: As a Type II, sir, your authority is limited, as I understand it, to maintaining the DataMaster, providing instruction to other Type II's, as well as Type III's, as well as doing field repairs?

A: Yes, sir. That is correct.

Q: And field repairs are specifically defined within the Code of State Regulations, correct?

A: Yes, sir.

Q: And what do field repairs consist of, sir?

A: We can change out the tape, the printer tape. I can't remember them all. Most—we don't do the field repairs, actually. If the DataMaster goes down, we send that in to the Missouri Safety Center, to Mr. Bob Welch. Most of the time he does our field repairs for us.

Q: And you know not the qualifications of Mr. Welch, do you, sir?

* * *

A: I believe Mr. Welch is also a Type II.

* * *

Q: You would agree with me that in approximately May, late April of last year, a new chip was installed, software was changed in the DataMaster, correct?

A: I believe so, sir. I'm not absolutely sure. I don't know if I did the maintenance in May or not. . . . But there—there probably was, I would say.

Q: Okay. And that changed the programming sequence of the DataMaster, did it not?

A: There again, I—I'm not absolutely sure what—what the chip did or if the chip was installed. I—I didn't do the maintenance in May.

Q: Would you agree with me that in approximately May, spring, early sum-

mer of the year 2000, the software was changed in the DataMaster?

A: I believe it was, according to the Department of Health.

Q: Okay. And you know not who changed that software, correct?

A: No, sir.

Q: All right. You know not the qualifications of the individual who made that change, correct?

A: Depending on who it could have been, no, sir.

There was no other evidence offered on this software change to the DataMaster.

Trooper Brenton then testified concerning the circumstances under which he placed Mr. Coyle under arrest. When the Director attempted to introduce the result of the DataMaster BAC test performed on Mr. Coyle as part of Trooper Brenton's police file, Mr. Coyle's counsel objected on the grounds that "any attempt to use the breath test result in this case would be in violation of the Code of State Regulations [promulgated by the Department of Health (DOH)] because the code does not permit any type of change of software." The Director countered that the CSRs did not even address software changes one way or the other. The Director maintained that the matter was irrelevant because what he has to show to make his prima facie case is that the instrument was maintained within thirty-five days prior to the test and that it met the DOH regulations. Counsel for the Director claimed that she had done so. The court then asked about the CSR regulating maintenance of the DataMaster. Specifically, the court inquired, "we do not know who performed the change of the computer chip, is that correct, based upon the evidence here?" Both parties answered in the affirmative. The trial court then admitted the Director's Exhibit A "with the exception of the objected to results of the test that was given." It clarified that the three places in the exhibit where the BAC test result was mentioned were not admitted. Later in the hearing, the Director again requested that the court consider admitting the BAC test result. Mr. Coyle's counsel renewed his objection based upon the software change, and the court again sustained the objection and clarified that the maintenance report on the machine did come in but the breath test result did not.

The Director also called Mr. Coyle as a witness. On direct examination by the Director, Mr. Coyle admitted that he had pleaded guilty to the criminal DWI charge.[2] Upon cross-examination by his own counsel, Mr. Coyle explained that he had considered taking his criminal case to trial, but due to economic considerations, he chose to plead guilty. Mr. Coyle also testified concerning the circumstances surrounding his arrest.

At the close of the evidence, Mr. Coyle's counsel moved "to set aside the Director's action, [because] the Director ha[d] failed to sustain her burden to show the breath alcohol concentration required in the statute." The Director's counsel responded by again asking the court to consider admitting the breath test, pleading that she believed she had proved her prima facie case and complied with DOH regulations and case law. The court sustained Mr. Coyle's motion and entered a judgment directing that the Director's suspension of

2. We note that § 302.505.3 states:
 The determination of [the facts necessary to support suspension under § 302.505.1] by the department is independent of the determination of the same or similar facts in the adjudication of any criminal charges arising out of the same occurrence. The disposition of those criminal charges shall not affect any suspension or revocation under this section.

Mr. Coyle's license be set aside. This timely appeal by the Director follows.

## Standard of Review

 Mr. Coyle's motion at the close of the Director's evidence was, in effect, a motion for directed verdict, which "in a court-tried case submits the issue for a decision on the merits and is considered to be a motion for a judgment pursuant to Rule 73.01." *The Cadle Co. v. Shearer*, 69 S.W.3d 122, 124 (Mo.App. W.D.2002). This is because:

> "In a trial without a jury, the judge is not only the trier of the facts but also the determinant of whether the plaintiff has shown a right to relief. It is for this reason that the motion for directed verdict, so apt in a jury case to differentiate the judge function as to whether the evidence is submissible from the jury function to find the facts and return a verdict under the instructions of the court, has no role or function in a trial to the court without a jury."

*Id.* (quoting *City of Hamilton v. Public Water Supply Dist. No. 2*, 849 S.W.2d 96, 100 (Mo.App. W.D.1993) (citations omitted)). Thus, rather than review for submissibility, we review the trial court's judgment reinstating Mr. Coyle's driver's license in accordance with *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)—

unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously declares or applies the law, we must affirm. *Id.*

## Driver's License Suspension Under § 302.505.1

On appeal, the Director argues that he proved his prima facie case, which was not rebutted by Mr. Coyle, so the trial court should have upheld the administrative suspension of Mr. Coyle's driver's license.

 The Director sought suspension of Mr. Coyle's driver's license per § 302.505.1, which provides in relevant part:

> The department shall suspend or revoke the license of any person upon its determination that the person was arrested upon probable cause to believe such person was driving a motor vehicle while the alcohol concentration in the person's blood, breath, or urine was ten-hundredths of one percent or more by weight, based on the definition of alcohol concentration in section 302.500.

At Mr. Coyle's trial de novo, the Director bore the burden of proving his prima facie case for suspension under this statute by a preponderance of the evidence. *Milligan v. Wilson*, 78 S.W.3d 215, 219 (Mo.App. W.D.2002).[3] The Director proves his pri-

---

3. On November 5, 2002, this court handed down its opinion in *Verdoorn v. Dir. of Revenue*, —— S.W.3d ——, WD 60784, 2002 WL 31452804 (Mo.App.W.D.2002) which overrules *Milligan* and a long line of this court's cases that misstate the driver's evidentiary rebuttal standard. Specifically, *Verdoorn* overrules the cases, like *Milligan*, that shift the burden of proof to the driver to rebut the Director's prima facie case by a preponderance of the evidence. While the purposes for which the overruled cases are cited herein remain valid law, we are compelled to mention that, in accordance with *Verdoorn*, the burden of persuasion remains on the Director

at all times. As explained herein, we hold that the Director established his prima facie case, so the trial court erred in refusing to admit Mr. Coyle's BAC result. Thus, we reverse the trial court's judgment and remand to allow Mr. Coyle to "present rebuttal evidence which raises a genuine issue of fact regarding the validity of the blood alcohol test results. The rebuttal evidence must be substantial and competent to challenge the presumption of validity established by the Director's *prima facie* case; but the driver's burden is one of production not persuasion. The Director retains the burden of proof throughout the proceeding and must ultimate-

ma facie case for suspension under § 302.505.1 by establishing by a preponderance of the evidence that:

> "(1) [Mr. Coyle] was arrested upon probable cause to believe that [he] was driving in violation of an alcohol related offense and
>
> (2) that [Mr. Coyle] had been driving with a blood alcohol content [ (BAC) ] of .10 percent or greater."

*Id.* (quoting *Weiland v. Dir. of Revenue,* 32 S.W.3d 628, 630 (Mo.App.2000) (en banc)[4]). Once the Director establishes his prima facie case, Mr. Coyle is afforded an opportunity to rebut. *Id.*

### Director's Prima Facie Case

### I. Probable Cause to Arrest

The first issue, then, is whether the Director met the first part of his burden by establishing by a preponderance of the evidence that Trooper Brenton had probable cause to arrest Mr. Coyle for driving while intoxicated. Mr. Coyle argues that Trooper Brenton lacked probable cause to arrest him because he "observed a single traffic violation credibly explained by [Mr. Coyle] then administered field sobriety tests in inappropriate conditions negating probable cause to arrest."

■ The standard for probable cause to arrest is an objective one—probable cause "exists when the facts and circumstances would warrant a person of reasonable caution to believe that an offense has been or is being committed." *Testerman v. Dir. of*

*Revenue,* 31 S.W.3d 473, 476 (Mo.App. W.D.2000).[5] Therefore, "whether probable cause existed to arrest [Mr. Coyle] is determined in relation to the circumstances as they would have appeared to a prudent, cautious, and trained police officer." *Id.*

■ Thus, we consider the circumstances surrounding Mr. Coyle's arrest. Mr. Coyle exited the Quik Trip parking lot and turned onto Gateway without turning on his vehicle's headlights. Despite Mr. Coyle's testimony that Quik Trip's lights made it appear "almost like 12:00 noon," it was after sunset, so he was required to turn on his lights before pulling onto the roadway.[6] He did not turn on his lights until after he had already pulled onto Gateway, just as Trooper Brenton drove by. Trooper Brenton then turned around and pulled him over. Trooper Brenton testified at the hearing that when Mr. Coyle sat in his police vehicle, he "smelled an odor of an intoxicating beverage," so he administered "the three standardized" field sobriety tests—"walk-and-turn, one-leg stand, and gaze nystagmus, plus the portable—or preliminary breath test." Trooper Brenton testified with regard to the results of the walk-and-turn test that Mr. Coyle "failed to keep his balance during the instruction portion, turned the wrong direction at the end, he missed ... five steps, and he used his arms for balance." He further testified that the preliminary breath test he performed on Mr. Coyle was positive for the presence of

---

ly convince the circuit court, by a preponderance of the evidence, that the driver drove while intoxicated."

**4.** Overruled on other grounds by *Verdoorn v. Dir. of Revenue,* —— S.W.3d ——, WD 60784, 2002 WL 31452804, *see* footnote 3.

**5.** Overruled on other grounds by *Verdoorn v. Dir. of Revenue,* —— S.W.3d ——, WD 60784, 2002 WL 31452804, *see* footnote 3.

**6.** *See* § 307.040.1 (stating in relevant part "[n]o person shall drive ... any vehicle ... on any street or highway [at any time from a half-hour after sunset to a half-hour before sunrise, § 307.020(9),] unless such vehicle ... displays lighted lamps and illuminating devices ...").

alcohol, that the four points Mr. Coyle scored on the horizontal gaze nystagmus indicated "there [was] a substance in [Mr. Coyle's] body that [was] affecting [Mr. Coyle]," [7] that Mr. Coyle's eyes were glassy and bloodshot and his pupils were dilated, that he "was swaying," and that his speech was slurred. Based upon his training, experience and observations of Mr. Coyle, Trooper Brenton then concluded that Mr. Coyle was "impaired" and placed him under arrest for driving while intoxicated.

■ Mr. Coyle presented evidence to rebut the Director's probable cause showing upon cross-examination of Trooper Brenton and through his own testimony. For example, he presented evidence that he had to perform the field sobriety tests in uncomfortable, "special occasion" cowboy boots, in a gravel parking lot, in "very cold" weather that he was not properly dressed for. He contends that the trial court "recognized the environmental effects surrounding the administration of tests and thus rejected the tests as any indicator of impairment thus negating the element of probable cause." While his evidence may, arguably, have established some doubt as to the validity of at least two of the field sobriety tests—the walk-and-turn and the one-leg stand tests:

> field sobriety tests are not mandatory. The results of such tests are merely an aid to be used by the officer in conjunction with other observations to determine if he has probable cause to arrest.

Even in the absence of any field sobriety tests, we have held similar observations by an arresting officer to constitute sufficient evidence to meet the test of probable cause.

*Terry v. Dir. of Revenue,* 14 S.W.3d 722, 724–25 (Mo.App. W.D.2000) (citations omitted).[8] In addition to Mr. Coyle's "poor" performance on the field sobriety tests, Trooper Brenton observed that Mr. Coyle had "glassy" and bloodshot eyes, dilated pupils, slurred speech, an odor of alcohol on his breath and he swayed as Trooper Brenton instructed him on how to perform the field sobriety tests. Even considering the evidence in a light most favorable to Mr. Coyle as we must on appeal, the facts and circumstances in this case would cause a "prudent, cautious, and trained police officer" to believe that Mr. Coyle was guilty of driving under the influence, so probable cause to arrest was properly established. *Testerman,* 31 S.W.3d at 476. *See, e.g., Hill v. Dir. of Revenue,* 985 S.W.2d 824, 829 (Mo.App. W.D.1998) (holding that the arresting deputy's testimony—that he pulled over the driver for driving a vehicle during the evening without the headlights on, that he smelled alcohol on the driver's breath, that the driver appeared to be intoxicated, and that the driver failed several field sobriety tests—was sufficient to establish probable cause to arrest the driver).

The Director met his burden of establishing probable cause to arrest—the first

---

7. *Milligan,* 78 S.W.3d at 220, footnote two, explains that for the horizontal gaze nystagmus test, three different tests that are indicative of alcohol influence are performed on each eye. For each indication of alcohol influence in the eye's movement, one point is assessed. A score of four to six points represents substantial evidence that the person being tested is intoxicated.

8. *Terry* involved this court's review of a setting aside of a revocation of respondent's driving privileges under § 577.041, which places a different initial burden upon the Director than in a hearing under § 302.535, but this general statement concerning field sobriety tests as supporting probable cause to arrest holds equally true establishing a prima facie case of probable cause for arrest under § 302.505.1.

prong of the Director's prima facie case for suspension of Mr. Coyle's driver's license.

## II. BAC at Least .10% at Time of Arrest

As previously explained, during Trooper Brenton's testimony, the Director attempted to introduce "Exhibit A," which consisted of, among other things, the arrest report and Mr. Coyle's BAC test result. Mr. Coyle objected to the admission of the BAC test result because Captain Archibald had testified concerning a software upgrade performed on the DataMaster. He maintained that because the Department of Health had not specifically sanctioned such upgrades in the Code of State Regulations, sections 19 CSR 25–30.031.3 through 30.080, his BAC result could not be admitted. The trial court apparently agreed with Mr. Coyle because it refused to admit any portion of Exhibit A that reflected the BAC test result.

The Director maintains on appeal that Captain Archibald's testimony concerning the maintenance check he performed on the DataMaster on October 1, 2000, coupled with Trooper Brenton's testimony concerning his administration of the breath test provide a sufficient foundation for the admission of Mr. Coyle's BAC. We agree.

■ Mr. Coyle's objection goes to the foundational prerequisites for admission of a BAC test result under the DOH regulations. The trial court agreed that because Mr. Coyle had provided evidence of a software change to the DataMaster, the result of a test performed thereon could not be admitted. As explained in *Testerman:*

> In order to establish a proper foundation for the admission of the result of a breathalyzer test to satisfy the BAC requirement of § 302.505, the Director must show that: (1) the test was performed by following the techniques and methods approved by the MDH, (2) by licensed medical personnel or by a person possessing a valid permit, and (3) using equipment and devices approved by the MDH [Missouri Department of Health (DOH)]. §§ 577.020.3–4[9]; 577.026, RSMo 1994. The MDH regulations governing the administration of breath tests are found in 19 CSR 25–30.011—25–30.080.

31 S.W.3d at 478. A long line of cases holds that once the Director proves these foundational requirements, the BAC result should be admitted.

■ We consider these requirements for admission of Mr. Coyle's BAC in turn:

> Requirement (1): Mr. Coyle does not contend that Trooper Brenton did not perform the tests correctly, and there is no indication that he did not properly perform the test.

> Requirement (2): Nor does Mr. Coyle contend that Trooper Brenton lacked the proper Type III permit to perform the test—it is clear from the evidence that he had the proper permit.

9. Section 577.020 provides in relevant part:
 3. *Chemical analysis of the* person's breath, blood, saliva, or urine to be considered valid pursuant to the provisions of sections 577.020 to 577.041 shall be performed according to methods approved by the state department of health and senior services by licensed medical personnel or by a person possessing a valid permit issued by the state department of health and senior services for this purpose.

4. The state department of health and senior services shall approve satisfactory techniques, devices, equipment, or methods to be considered valid pursuant to the provisions of sections 577.020 to 577.041 and shall establish standards to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits which shall be subject to termination or revocation by the state department of health and senior services.

Requirement (3): *Testerman* explains:

As to the third requirement, if a timely objection is made to the admission of the [BAC test result], the Director must show that a maintenance check of the breathalyzer machine[10] used had been conducted by a Type II permit holder within 35 days of the date on which the test was administered, as required by 19 CSR 25–30.031(3). "The regulations regarding the maintenance checks dictate that compliance is mandatory." *See* 19 CSR 25–30.031(3).

*Id.*

 Mr. Coyle objected to the admission of the BAC. Captain Archibald testified that he held the required Type II permit. He further testified that on October 1, 2000, he performed the required maintenance check on the DataMaster[11] used to test Mr. Coyle's BAC on October 1, 2000. This was just seven days before Mr. Coyle's test, which is well within the thirty-five-day time frame for performing mandatory maintenance checks established by the DOH. He explained that he followed, without deviation, the DOH-mandated checklist[12] in maintaining the machine, and he found the DataMaster to be "functioning within the Department of Health guidelines," so there was no indication that the software change had any effect upon the machine.

We hold that the Director laid a proper foundation for the introduction of the BAC evidence necessary to establish a prima facie case. Mr. Coyle's .137% BAC result should have been admitted. The Director established his prima facie case. Accordingly, we reverse the trial court's judgment. Because the trial court did not admit the BAC result into evidence, Mr. Coyle did not have ample opportunity to rebut the Director's prima facie case. Therefore, we remand the case to the trial court "to provide Mr. Coyle the opportunity to present a defense," and, if he so chooses, to allow the Director the opportunity to likewise rebut his defense.

BRECKENRIDGE, P.J., and HOLLIGER, J., concur.

---

**10.** *See* 19 CSR 25–30.031(3) for maintenance check requirements on breathalyzers.

**11.** The DOH expressly approves use of the DataMaster breathalyzer machine in 19 CSR 25–30.050(1).

**12.** *See* 19 CSR 25–30, Form # 6 "DataMaster Maintenance Report" for a form for this checklist.