Donald W. RECKNER, Respondent,

v.

Carol Russell FISCHER, Director of Revenue, State of Missouri, Appellant.

No. WD 62023.

Missouri Court of Appeals, Western District.

Dec. 9, 2003.

---

4. The Director uses the incorrect standard of review when discussing this point, claiming the trial court's decision was against the weight of the evidence, not supported by substantial evidence, and misapplied the law. This first point, however, deals only with the decision to exclude evidence and, therefore, is a question of abuse of discretion.

Karen P. Hess, Jefferson City, MO, for appellant.

Kenneth M. Hayden, Versailles, MO, for respondent.

Before THOMAS H. NEWTON, P.J., PATRICIA BRECKENRIDGE and PAUL M. SPINDEN, JJ.

THOMAS H. NEWTON, Judge.

Mr. Donald W. Reckner's driver's license was revoked by the Director of Revenue under section 302.505[1] because he was driving a vehicle while his blood alcohol content (BAC) was in excess of .08.[2] At a hearing, Mr. Reckner objected to the admission of his BAC test result because

---

1. Unless otherwise indicated, all statutory references are to RSMo.2000.

2. Section 302.505 was changed effective September 29, 2001, requiring a BAC of .08 percent instead of .10 percent. § 302.505 (Cum. Supp.2002).

there was evidence showing that, on some occasions, the breathalyzer machine gave readings elevated by .004. He presented rebuttal evidence through the testimony of a law enforcement officer who observed the machine give elevated readings over a month after his test. Although the Missouri Department of Health (MDH) regulations allow the breathalyzer to operate with a deviation of +/-.005, the trial court sustained Mr. Reckner's objection to the admission of the test results and reinstated his license. We reverse.

## I. Factual and Procedural Background

On November 3, 2001, Mr. Reckner was arrested by Trooper Anthony Piercy of the Missouri State Highway Patrol on probable cause for driving while intoxicated. At the hearing in this case, Trooper Piercy testified that he had a Type III permit, which allowed him to give a breath test using the Data Master breath analyzer machine. He administered a breath test on Mr. Reckner using that machine. Trooper Piercy followed the MDH's approved checklist in performing the test. Mr. Reckner gave a breath sample of .144 blood alcohol concentration. The machine performed its own internal standard checks before and after the test and indicated it was operating properly.

Trooper William Surface is a Type II permit holder, which entitles him to give breath tests and to perform maintenance checks on the Data Master machine. He testified that on October 8, 2001, he performed a maintenance check on the Data Master machine. He used the MDH's approved checklist and followed its guidelines in performing the check. The calibration check gave results of .099, .099, and .098, all of which were within the allowed deviation of +/-.005 from the .100 solution.

Although the record is not clear on this matter, it appears that on and possibly before October 8, 2001, and certainly between October 8, 2001, and January 13, 2002, the machine sometimes gave a reading of .004 when a reading of .000 was expected. Trooper Surface also testified that in the middle of December he was told that the Data Master was reading .004 on several occasions. At that time, he checked the machine and it tested .000.

Around the 12th or 13th of January 2002, Trooper Surface checked the machine again and got a reading of .004 when he gave a breath sample, so he took it out of service and had it checked. Mr. Jerry Kraus, the technician who was the head of the Data Master program, took the machine apart and found a piece of debris in the sample chamber, although he found nothing mechanically or electronically wrong with the machine. Trooper Surface testified that in his training he had learned that a piece of debris of this size could alter the reading of the Data Master by .004, but no further. Upon further questioning by the trial court it was determined that this information about the debris came from his discussion with Mr. Kraus. Trooper Surface also acknowledged that there was not any way of knowing when the debris got into the sample chamber and no way to know what tests were affected by it and what tests were not affected, although there were tests throughout this time with a result of .000. Mr. Reckner objected to the admission of the test results from the Data Master, and the trial court reserved its ruling until the close of the case.

To rebut the Director's case, Mr. Reckner introduced the testimony of Deputy Jason Worthley, of Morgan County, a Type III permit holder. Deputy Worthley operated the Data Master in question between December 5, 2001, and January 15, 2002, and on several occasions, he personally observed the machine give readings of

.004 on breath samples that had no alcohol. He also gave a breath sample without alcohol and the machine registered a result of .004. After hearing all of the evidence, the trial court excluded the breath test results from evidence and reinstated Mr. Reckner's driving privileges. The trial court concluded that the Director did not have probable cause to believe Mr. Reckner was driving with a BAC of .08 percent or greater.

The Director raises two points on appeal.[3] Her first point is that the trial court erred when it excluded the results of Mr. Reckner's breath test.[4] The Director asserts that she established the necessary foundational elements to admit the test results. The Director's second point is that the trial court erred in setting aside the Director's revocation of Mr. Reckner's driving privileges because such decision was against the weight of the evidence, not supported by substantial evidence, and misapplied the law. The Director claims that she met the requirements to support revocation of Mr. Reckner's license and Mr. Reckner did not rebut her prima facie case.

## II. STANDARD OF REVIEW

■ The trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *State v. Rose*, 86 S.W.3d 90, 99 (Mo.App. W.D.2002). This court will find an abuse of discretion only when the trial court makes a ruling that is clearly against the logic of the circum-

stances that is so arbitrary and unreasonable as to shock the sense of justice and shows a lack of careful consideration. *Id.* at 99–100.

■ We review the trial court's judgment after a trial de novo under the *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), standard. *Neeley v. Dir. of Revenue*, 104 S.W.3d 797, 800–01 (Mo.App. W.D.2003). We will affirm the judgment of the trial court unless there is no substantial evidence to support it, the judgment is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32. This court accepts the evidence supporting the trial court's judgment and all reasonable inferences therefrom as true, disregarding all contrary evidence and inferences. *Reynolds v. Dir. of Revenue*, 20 S.W.3d 571, 574 (Mo.App. W.D.2000) (*overruled on other grounds by Verdoorn v. Dir. of Revenue*, No. SC 85101, 2003 WL 22792243 (Mo. November 25, 2003)).

## III. LEGAL ANALYSIS

■ The Director has the burden to establish a prima facie case for the suspension of a driver's license by a preponderance of the evidence. *Weiland v. Dir. of Revenue*, 73 S.W.3d 60, 62 (Mo.App. W.D. 2002) (*overruled on other grounds by Verdoorn*, 119 S.W.3d at 546–47). The Director must show that there was probable cause to arrest the driver for driving while intoxicated and that the driver's BAC exceeded the legal limit. *Id.*;[5] § 302.505.

---

**3.** This case was argued with *Shewmaker v. Director of Revenue*, WD 62021 121 S.W.3d 294, 2003 WL 22886159 (2003), also decided this day. The facts and the arguments are similar, with only minor differences that are noted as necessary.

**4.** The Director uses the incorrect standard of review when discussing this point, claiming the trial court's decision was against the

weight of the evidence, not supported by substantial evidence, and misapplied the law. This first point, however, deals only with the decision to exclude evidence and, therefore, is a question of abuse of discretion.

**5.** *Weiland* was decided when the BAC limit was .10 percent instead of the present limit of .08 percent; however, the change in legal

Once the Director establishes a prima facie case, the burden of production shifts to the driver to rebut the Director's case by raising a genuine issue of fact regarding the validity of the blood alcohol test results, but the burden of persuasion always remains on the Director. *Verdoorn,* 119 S.W.3d at 545–46.[6]

There is no dispute over whether Trooper Piercy had probable cause to arrest Mr. Reckner for driving while intoxicated. The only dispute is whether the Director proved that Mr. Reckner's BAC was .08 percent or greater, and, if so, whether Mr. Reckner rebutted the Director's proof.

## A. Exclusion from Evidence of Breath Test Results

 Breath test results are essential to establish the Director's prima facie case and a breathalyzer machine is generally accepted to be a reliable device for measuring BAC. *Lewis v. Lohman,* 936 S.W.2d 582, 585 (Mo.App. W.D.1996). The MDH regulations with respect to breath analyzer machines are contained in 19 C.S.R. 25–30.011–25–30.080. To establish a proper foundation for admission of a breathalyzer test, "the Director must show that: (1) the test was performed by following the techniques and methods approved by the MDH, (2) by licensed medical personnel or by a person possessing a valid permit, and (3) using equipment and devices approved by the MDH." *Testerman v. Dir. of Revenue,* 31 S.W.3d 473, 478 (Mo.App. W.D. 2000) *(overruled on other grounds by Verdoorn,* 119 S.W.3d at 546–47). If a timely objection is made with respect to the third requirement, the Director must show a maintenance check of the breath analyzer

machine used was performed by a Type II permit holder within thirty-five days of the test as required by 19 C.S.R. 25–30.031(3). *Id.* Once these foundational requirements are shown, the BAC result should be admitted. *Coyle v. Dir. of Revenue,* 88 S.W.3d 887, 895 (Mo.App. W.D.2002). The Director has made a prima facie foundation for the admission of the test results once she presents evidence that the test was performed by a certified operator in accordance with MDH operating procedures on approved equipment. *State v. Litterell,* 800 S.W.2d 7, 11 (Mo.App. W.D. 1990).

Mr. Reckner objects to the admission of the Data Master test results, claiming the Director failed to meet the third requirement. Mr. Reckner claims that sometimes the Data Master gave a reading elevated by .004 around the time he was tested, and that shows the machine was malfunctioning and, therefore, was not a device "approved" by the MDH. The trial court apparently adopted this viewpoint and refused to admit the test results. Mr. Reckner's claim presents two interrelated questions. First, we must determine whether a machine that sometimes gives a reading that is elevated by .004 is malfunctioning. Second, we must determine whether the fact that the evidence shows that some readings were elevated by .004 allows for an inference that the readings were never elevated higher or an inference that the elevated readings may be indicative of a greater problem.

 The Director does not have to prove that the machine worked properly on the date the test was given. *Collins v.*

limit does not affect the application of the law.

6. *Verdoorn* overrules a number of cases that held that the driver had to rebut the Director's prima facie case by a preponderance

of the evidence. These cases, many of which are cited here, have been overruled only to the extent that they misstate the driver's burden of proof.

*Dir. of Revenue*, 691 S.W.2d 246, 253 (Mo. banc 1985) (*superseded by regulation as stated in Sellenriek v. Dir. of Revenue*, 826 S.W.2d 338, 340 (Mo. banc 1992)). "[A] contention that the machine was not then in proper operating condition can only be validly made by some evidence that suggests that 'a malfunction occurred despite adherence by the testing officer to correct methods.'" *Litterell*, 800 S.W.2d at 11 (quoting *Collins*, 691 S.W.2d at 253). But once a malfunction is shown, the Director must show the reliability of the test results. *See Lasley v. Dir. of Revenue*, 17 S.W.3d 174, 177 (Mo.App. W.D.2000) (*overruled on other grounds by Verdoorn*, 119 S.W.3d at 547–48) (because the evidence raised a question about the effectiveness of the simulator solution the Director had the burden to show the solution was not deficient). Although Mr. Reckner tries to convince us that the Director actually proved the Data Master was malfunctioning and, therefore, the Director must prove it worked on the day of the test, he fails, as discussed below. The regular maintenance checks are designed to ensure the machine is functioning properly and to ensure the reliability of a particular test. *Sellenriek*, 826 S.W.2d at 340. These checks are done because "even fastidious observance of the approved testing procedures cannot overcome a fault in the testing device itself." *Litterell*, 800 S.W.2d at 11. Proof of a maintenance check showing the machine was operating within Department of Health regulations within thirty-five days of the date of the test lays a proper foundation that the device is approved. *See Coyle*, 88 S.W.3d at 896; *see also Sellenriek*, 826 S.W.2d at 340 (stating that if proof of a maintenance check is offered, then compliance with that aspect of the regulation is shown because that is evidence the test was performed according to approved techniques and methods on a reliable machine).

Mr. Reckner claims that the periodic elevated readings of .004 show the Data Master had a fault, such that a showing that Trooper Piercy followed the testing procedures and Trooper Surface did a maintenance check is not sufficient to overcome this problem. But Mr. Reckner stretches the definition of malfunction too far. The regulations contain specific procedures for performing maintenance checks on the Data Master to ensure its reliability. 19 C.S.R. 25–30.031(7), Form 6. Included on Form 6 is the rule for running a calibration check. *Id.* The Type II permit holder must run three tests using a standard solution and the tests must be within +/–5% of the standard value and have a spread of .005 or less. *Id.* Trooper Surface ran three calibration checks on October 8, 2001, using .100% solution. Under the regulations, the tests should have registered between .095% and .105%, and they did. Mr. Reckner is complaining about a deviation of .004. But .004 is within the regulation-approved deviation of .005. Trooper Surface testified that even in December, when he ran a check, the machine gave the expected result of .000, clearly within the MDH regulations. Trooper Surface did not get a reading elevated by .004 until January 2002. But according to the regulations, even then he did not have to take the machine out of service because it was still within the regulations. So we do not see how an elevated reading of .004 is a malfunction.

Under our case law, if this was a malfunction, even a minor one, the test results would be inadmissible. Mr. Reckner relies on several of these cases to support the trial court's decision to not admit his test results. But in all of these cases the court found a malfunction because the machine was working outside the parameters established by the regulations. *See Kennedy v. Dir. of Revenue*, 73 S.W.3d 85, 86–87 (Mo.

**303**

App. S.D.2002) (*overruled on other grounds by Verdoorn,* 119 S.W.3d at 546–47) (holding that the trial court correctly denied admission of test results when the machine gave a status code reading that the "system won't zero" after the initial test and, instead of letting a maintenance person know about the malfunction and suspending use of the machine, as required, the officer performed another test with the malfunctioning machine three minutes later); *Lasley,* 17 S.W.3d at 177 (holding that the trial court correctly denied admission of test results when the maintenance report stated the simulator solution expired in 1991, although the certificate of analysis for the solution said the expiration date was in 1999; the driver was tested in 1998 and the Director offered no evidence showing the report had a misprint to counter the implication that the machine was using an expired solution that would make it function improperly); *Endsley v. Dir. of Revenue,* 6 S.W.3d 153, 158, 164–65 (Mo.App. W.D.1999) (*overruled on other grounds by Verdoorn,* 119 S.W.3d at 547–48) (holding that the trial court correctly excluded test results where the maintenance report did not have a checkmark showing the simulator temperature was determined, evidence showed that if the temperature was outside the regulation range it would affect the BAC reading, and the trial court determined that the failure to check that portion of the report was not because the officer forgot to check it but because he did not perform that step of the maintenance check); *State v. Young,* 525 S.W.2d 440, 440–41 (Mo.App.1975) (finding that test results were inadmissible when the air chamber of the breathalyzer machine is supposed to hold 52.5 milliliters of air and it contained 56.5 milliliters of air, which could result in a higher BAC reading).

*State v. Deimeke,* 500 S.W.2d 257, 258–59 (Mo.App.1973), is the only case Mr. Reckner relies on that is even close to this situation, but there are still important distinctions. In *Deimeke* a maintenance check was done on December 1, 1970, and the breathalyzer was working properly. *Id.* at 258. The driver was tested on December 13, 1970. *Id.* The machine was checked on January 2, 1971, and it exceeded the set limit for delivery time. *Id.* The maintenance officer cleaned the machine and it worked again. *Id.* Because the machine was operating outside the MDH operating procedures, it was malfunctioning. *Id.* at 259. The test results were inadmissible because there was no evidence to fix when the machine began to operate outside the time prescribed by the regulations. *Id.* The driver's test was done sometime between when the machine worked and when it stopped working and the jury could not speculate when the increased delivery time occurred. *Id.*[7]

The present case also concerns a problem with the machine that developed after the maintenance check, and it is impossible to pinpoint when the problem developed. But this case is different from *Deimeke* on one fundamental issue: the elevated reading of .004 is not outside the MDH regulations, while the longer delivery time in *Deimeke* was outside the regulations. No evidence was presented about the results of the next maintenance check on the Data Master used in this case and Trooper Sur-

---

7. It is unclear how *Deimeke* would apply today because the regulations now require maintenance checks every thirty-five days, and a proper maintenance check lays a foundation for claiming the machine is approved. *Coyle,* 88 S.W.3d at 896. We were unable to find any case law, since the maintenance check regulation was passed, discussing the effect of a maintenance check done after the driver's test on the admission of test results done within thirty-five days of a prior maintenance check.

face testified that when he checked the machine in December it tested at .000. Trooper Surface did not get an elevated reading until January 2002, over two months after Mr. Reckner's test. Even then the results were not outside the MDH regulations, but even if they were that would be irrelevant with respect to Mr. Reckner's test. *See Poage v. Dir. of Revenue*, 948 S.W.2d 194, 197 (Mo.App. E.D.1997) (holding that the maintenance report on which the driver relied that was completed four months after his arrest was irrelevant because it was not within the thirty-five day testing period surrounding the driver's arrest).

None of the cases Mr. Reckner relies on dealt with a problem where the machine was not working optimally but was still compliant with the regulations, such as the case here,[8] and he presents no authority for finding that such a situation is a malfunction. We find cases where the driver attempted to impose more stringent rules on the Director than are in the regulations to be more analogous to the present case. Those cases persuade us that this elevation of .004 has no effect on the functioning of the Data Master or on the admissibility of the test results.

In *Coyle,* the trial court sustained an objection to the admission of the driver's test results because of an unauthorized software change made to the breathalyzer machine. 88 S.W.3d at 889. The officer who performed maintenance checks on the machine testified that he had done a check on the machine seven days before the driver's test, following the mandated checklist, and the machine was functioning within

the guidelines. *Id.* at 890. The evidence also showed that the software in the machine had been changed, and the driver claimed that because such changes were not permitted in the regulations, any results from the machine were inadmissible. *Id.* at 891. This court held that once the three foundational requirements for admission of a breathalyzer test are satisfied, the results should be admitted. *Id.* at 895. The claim about the software represented an objection based on the third requirement, that the device be approved by the Department of Health, which is addressed by showing a maintenance check had been done within the thirty-five days prior to the test. *Id.* This court held that because all the foundational requirements had been met, the maintenance check followed the checklist, and the machine was functioning within the guidelines so there was no indication the software affected the machine, the results should have been admitted. *Id.* at 186. Similarly here, whether the Data Master was giving slightly elevated readings or not, it was at all times functioning within the guidelines, particularly during the October 8, 2001, maintenance check that occurred before Mr. Reckner's test. Software changes are not discussed in the regulations, but this court in *Coyle* focused on the fact that the machine functioned within the regulation guidelines. In this case, where there were no extraneous changes to the Data Master, we can only focus on its functioning, and because that was always within the regulations there was no malfunction.

In *Testerman,* the driver claimed, among other things, that the maintenance

---

**8.** Had the machine been giving elevated readings of .006 or more, this would be a different case. The machine would be operating outside the regulations, which is a malfunction. Under that circumstance, Mr. Reckner's cases would clearly direct this court to find that the Data Master was malfunctioning and the test results could not be admitted. The regulation-imposed deviation of +/-.005 creates a bright line for courts to determine if a breath analyzer machine is working. The Director's reliance on this bright line does not create a "degrees of malfunction" test as Mr. Reckner suggested in oral argument.

check was done improperly because although the officer checked the box indicating he had checked the simulator temperature, he did not indicate the specific temperature on the form. 31 S.W.3d at 478–79. This court found that there was no requirement that the maintenance officer indicate a specific temperature, only that the temperature be within the allowed limits and that a checkmark be made on the report showing the temperature is within those limits. *Id.* at 479. This view was further supported by the fact that the maintenance report has blanks by the maintenance steps where a specific value must be written in, and the simulator temperature is not one such step. *Id.* at 479–80. *Testerman* was distinguishable from *Endsley* because in *Testerman* the officer did not leave out a step of the maintenance check. *Id.* at 479. This court held that because the officer was not required to list the simulator temperature, the court can not infer that a required step was missed because such temperature was not listed. *Id.* at 480. When considered in light of *Testerman,* Mr. Reckner's claim is clearly invalid. Mr. Reckner is complaining about a deviation that is within the regulations. If the maintenance officer is not required to add more information to the report than is requested, he is equally not required to believe a machine is malfunctioning when it produces results within the deviation prescribed by the regulations.

Finally, in cases where the driver complained that the test results were inadmissible because the simulator solution had an aqueous concentration slightly above that listed in the regulations, the court found the results admissible because the solution was still within the acceptable range. *Bescheinen v. Dir. of Revenue,* 999 S.W.2d 324, 325–26 (Mo.App. W.D.1999) (finding that the solution with an aqueous ethanol concentration of .1212 g/dl wt./vol. com-

plied with Department of Health regulations that it be .1210 g/dl wt./vol. with a range of +/-three percent); *Guccione v. Dir. of Revenue,* 988 S.W.2d 649, 653 (Mo. App. E.D.1999) (*overruled on other grounds by Verdoorn,* 119 S.W.3d at 547– 48) (finding the simulator solution of .1213 g/dl wt./vol. was within the regulation requirement of .1210 g/dl +/-three percent (wt./vol.)). The simulator solution is used for the calibration checks. If the solution used to run those checks is acceptable when within the range listed by the regulations, then the resulting calibration check within the deviation listed by the regulations is equally acceptable. Again, even assuming the Data Master was registering .004 when Mr. Reckner's test was given, that result is still within the calibration deviation listed in the regulations.

Although the calibration checks on October 8, 2001, were actually low (.099 and .098), even if they had registered the elevated reading of .004 and so read .104, that would not make the test results inadmissible. And Mr. Reckner would not be entitled to a .004 grace in his BAC result just because that elevation, which is within the regulations, exists. The Missouri courts have established that the Director needs to prove only that the driver's BAC was at or above the legal limit, not at the threshold limit within the .005% margin of tolerance. *Green v. Dir. of Revenue,* 961 S.W.2d 936, 940 (Mo.App. E.D.1998) (*overruled on other grounds by Verdoorn,* 119 S.W.3d at 547–48); *Lewis,* 936 S.W.2d at 585. In fact, because Mr. Reckner's BAC was .144, even if he was granted a .004 grace, reducing his BAC to .140, he would still be above the legal limit of .08. *See State ex rel. Dir. of Revenue v. Conklin,* 997 S.W.2d 121, 124 (Mo.App. S.D.1999) (appellate court agreed with Director's claim that even if the machine was testing .002 too high, based on the calibration check's high-

est result of .102, and the simulator solution had an alcohol value .003 too high but within its variance, this total possible variance of .005 did not lower the drivers' BAC of .108 to below the legal limit of .10%).

To further support the trial court's decision to exclude the test results, Mr. Reckner asserts that there was a piece of debris in the machine and no one knows how long it was there. He claims that the effect of this debris on various readings cannot be ascertained. Trooper Surface, however, testified that in his training he learned that this piece of debris, because of its size, could alter the reading of the Data Master by only .004.[9] Mr. Reckner claims that because Trooper Surface had no personal knowledge of the effect of the debris, his information came from Mr. Kraus, who maintains all the machines, this is not proof that the debris would only elevate the readings by .004. He focuses on the trial court's questioning about how Trooper Surface learned what effect the debris would have, particularly how the trial court drew out that Trooper Surface was relying on the technician's information and not his personal knowledge.

■ Whether the trial court disregarded Trooper Surface's explanation of the impact of the debris, as Mr. Reckner suggests, or not, no evidence was presented that the Data Master ever gave a reading elevated above .004. Each party, however, interprets this differently, insisting the other party's interpretation amounts to speculation. Mr. Reckner claims the Director's position that the elevation was consistently .004 and never elevated higher, is speculation. The Director claims

that Mr. Reckner's assertion that the .004 elevation may be indicative of a greater problem, and suggesting no results are reliable, is pure speculation. While the trial court may rely on inferences from the evidence, those inferences must be reasonable and cannot rely on guesswork, conjecture, or speculation. *Testerman,* 31 S.W.3d at 483. Based on the fact that all the evidence showed elevated readings of only .004, it appears that Mr. Reckner's supposition requires more speculation than that of the Director. Regardless of the effect of the debris, there were never any readings higher than .004. The only reasonable inference based on this evidence is that the Data Master sometimes gave readings elevated by .004, but no more, and that there was no greater problem.

Mr. Reckner's reliance on Deputy Worthley's testimony that the Data Master gave erroneous readings in December and January is irrelevant, as is the fact that Trooper Surface decided to pull it out of service on January 15, 2002, because he was concerned about the elevated readings. All of these occurrences were not within the thirty-five day testing period surrounding Mr. Reckner's test and, therefore, are irrelevant. *Poage,* 948 S.W.2d at 197. Although there is no way of knowing when the debris became lodged in the chamber and how often it affected the readings, there is no evidence that the Data Master ever failed its maintenance check. The only evidence is that in January 2002, Trooper Surface pulled it out of service because the reading was too high, although still within the regulations. That high reading impacts only tests given with-

---

9. What is not clear from the testimony is whether the debris will always elevate the readings by .004, or if it merely may elevate the readings up to .004. Neither party discussed this issue, and the record sheds no light on this matter, other than Trooper Sur- face's statement that the debris "could alter the reading." Because there were also readings of .000 during the time the debris was possibly in the machine, it is reasonable to conclude the debris can alter the readings up to .004, but does not always do so.

in thirty-five days of that date, not Mr. Reckner's test on November 3, 2001.

Mr. Reckner repeatedly states that the Director had the burden to show the Data Master was functioning on November 3, 2001, because of the evidence that the Data Master was malfunctioning. *See Lasley*, 17 S.W.3d at 177. But because we find that the Data Master was not malfunctioning—it was operating within the MDH regulations—his assertion is incorrect.[10] The Director did not have to prove the machine was working properly when Mr. Reckner was tested. *Collins*, 691 S.W.2d at 253. Mr. Reckner did not provide evidence showing the machine malfunctioned. The Director met her burden to show the test results were reliable by showing the elevation was within the range stated in the regulations. Because we hold that the Director laid a proper foundation for the introduction of the breath test results, those results should have been admitted. *Coyle*, 88 S.W.3d at 895. The trial court abused its discretion in excluding them.

## B. Mr. Reckner's Rebuttal Evidence

■ As discussed above, to establish a prima facie case the Director must show that there was probable cause to arrest the driver for driving while intoxicated and that the driver's BAC exceeded the legal limit. *Weiland*, 73 S.W.3d at 62. Based on our holding that Mr. Reckner's test results should have been admitted and the undisputed fact that Trooper Piercy had probable cause to arrest Mr. Reckner, the Director established her prima facie case to suspend Mr. Reckner's license under section 302.505. Because the trial court

did not rule on the admission of the results until after all the evidence was submitted, Mr. Reckner had the opportunity to rebut the Director's case. We must now determine whether Mr. Reckner successfully rebutted the Director's case by raising a genuine issue of fact about the validity of the blood alcohol results. *Verdoorn*, 119 S.W.3d at 546–47.

Because the trial court found in Mr. Reckner's favor, all the evidence must be viewed in the light most favorable to him. *Reynolds*, 20 S.W.3d at 574. But the evidence Mr. Reckner presented through Deputy Worthley to rebut the Director's case does not show that Mr. Reckner's BAC was, in fact, below .08%. Mr. Reckner was tested on November 3, 2001. Deputy Worthley's testimony tells us nothing about Mr. Reckner's BAC that night, and it tells us nothing about how the Data Master was functioning in November. Instead, Deputy Worthley's testimony only shows that the Data Master gave elevated readings between December 5, 2001, and January 15, 2001. This merely suggests the machine was not working optimally in December and January, which is irrelevant when considering a test performed in November. *See Poage*, 948 S.W.2d at 197. Furthermore, his testimony tells us solely that the machine gave readings elevated only by .004, which, as already discussed, is not a malfunction. This testimony was insufficient to rebut the presumption that Mr. Reckner had a BAC above .08% as established by the Director's prima facie case. *See Verdoorn*, 119 S.W.3d at 546–47 (expert testimony showing the driver's BAC might have been above or below the

---

**10.** During oral argument, and in the *Shewmaker* brief, Mr. Reckner's attorney asserted that 19 C.S.R. 25–30.011(5) required suspension of the use of the Data Master because a breathalyzer operator must "[i]mmediately suspend use of a breath analyzer that is not functioning properly." 19 C.S.R. 25–30.011(5). But because we have determined that the machine was always functioning properly, although not perfectly, this regulation has no application to this case.

legal limit was not sufficient to rebut the presumption of intoxication because it does not show his BAC was in fact below the legal limit).

### IV. CONCLUSION

We find that the trial court abused its discretion when it excluded Mr. Reckner's BAC test results. With that evidence, the Director established her prima facie case. Mr. Reckner's evidence did not rebut the Director's prima facie case because he did not raise a genuine issue of fact about his test results. We, therefore, reverse the decision of the trial court and uphold the Director's decision to revoke Mr. Reckner's driver's license.

PATRICIA BRECKENRIDGE and PAUL M. SPINDEN, JJ., concur.